NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

S. E. NICHOLS–DOVER, INC.; Spencer
Shoe Corporation and IMAC Food
Systems, Inc.

No. 17479.

United States Court of Appeals
Third Circuit.

Argued May 5, 1969.

Decided Aug. 4, 1969.

Corinna Lothar Metcalf, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frank H. Itkin, Attorney, N.L.R.B., on the brief), for petitioner.

James L. Burke, Elmira, N. Y., for respondents.

Before McLAUGHLIN, KALODNER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its October 18, 1967, order,[1] entered in favor of the Retail Store Employees' Union (the Union) and against respondents, S. E. Nichols-Dover, Inc. (Nichols), Spencer Shoe Corporation (Spencer), and IMAC Food Systems, Inc. (IMAC). See 29 U.S.C.

1. Reported at 167 N.L.R.B. No. 121.

§ 160(e). The order directed the respondents to: (a) cease and desist from certain unfair labor practices under §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a) (1) and (3); (b) offer reinstatement and back pay to two employees found to have been unlawfully discharged by Nichols under § 8(a) (3) of the Act; (c) upon request, bargain collectively with the Union as the exclusive representative of the employees of Nichols, Spencer, and IMAC.

The Nichols department store in Dover, Delaware, is one of several such stores located in the eastern United States and owned by a parent corporation. Spencer and IMAC are licensees of Nichols and operate, respectively, the shoe shop and the snack bar within the Dover store. The Union has been attempting to organize the employees of the store since it opened in August 1965.[2]

With the summer of 1966, the Union drive entered a more intensive phase involving the solicitation of authorization cards. Conflicting testimony was given at the hearing regarding the manner in which Nichols responded to this new campaign. The examiner, however, credited testimony given by the employees, which is entitled to our acceptance, see Universal Camera Corp. v. N. L.R.B., 340 U.S. 474, 495–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and which was to the following effect. Nichols representatives convened several meetings of store employees. The officials declared that the store did not need a middleman (the Union), and emphasized that any employee who had signed an authoriza-tion card had a right to revoke it. They also assisted with letters of revocation in ways calculated to insure their effectiveness, such as suggesting that carbon copies be made for safekeeping in the Nichols office and providing stationery, postage, the Union's address, and mailing services. Store Manager Jones and other officials spoke with several employees individually, asking them whether they had been approached by Union organizers and how they and their co-workers felt about the Union. In addition, Jones told Mrs. Ippolito, a Union sympathizer, that he could not understand why anyone would want to pay Union dues when they could simply request a raise. He also warned her that he had placed a spy at a Union meeting she had attended.

On October 27, 1966, Nichols received a letter from the Union dated the previous day, stating that it represented an "overwhelming majority of the employees in the S. E. Nichols store," offering to substantiate such majority by proof, and "request[ing] a meeting to commence negotiations for a collective bargaining agreement". Nichols responded, under date of November 1, that it "cannot at this time consent to recognize the * * * Union as bargaining agent at the Dover store," suggesting an election be held instead. It cited "pending charges against the union, alleging coercive activity,"[3] as well as alleged statements of employees indicating that only a small minority actually desired representation and that some feared Union retaliation if they failed to support it.

2. Shortly after the opening, Nichols discharged two employees because, the Board held in prior unfair labor practice proceedings, of their Union sympathies. Reinstatement of both employees was ordered. See N. L. R. B. v. S. E. Nichols-Dover, Inc., 159 N.L.R.B. 1071 (1966), enf. 374 F.2d 115 (3rd Cir. 1967); S. E. Nichols-Dover, Inc., 165 N.L.R.B. No. 135 (1967). Also, we note, parenthetically, that efforts by this Union to organize employees at the Elmira, New York, store owned by Nichols' parent corporation gave rise to the commission of unfair labor practices. See N. L. R. B. v. S. E. Nichols Company, 380 F.2d 438 (2nd Cir. 1967).

3. The record does not disclose what the substance of these charges was, although it is apparent that they were later dismissed. We note that Nichols would have been entitled to insist on an election at that time without the necessity of citing any such justification or of submitting to a card check. See footnote 7.

Several weeks later, Jones became angry over a work dispute between three office employees, including Mrs. Ippolito and also Mrs. Hennessy, who was an active Union organizer. He threatened to fire all of them if another such argument arose, adding that he would lock the store's doors rather than open them to the Union. Three weeks later, on December 28, 1966, Mrs. Ippolito and Mrs. Hennessy were discharged along with a large number of temporary Christmas help. The Union, which had already filed unfair labor practice charges against Nichols on December 5, amended the charges to include an allegation that they had been unlawfully discharged because of their Union activity.

A complaint issued from the General Counsel and a hearing was conducted before a trial examiner. In his decision of June 20, 1967, the examiner held that the respondents had committed various unfair labor practices under § 8(a) of the Act. Specifically, he found that the statements made by Nichols representatives at the group meetings and also during interrogations of individual employees unlawfully tended to coerce the employees into revoking their authorization cards in violation of § 8(a) (1). Also found violative of § 8(a) (1) were the statements made by Jones to Mrs. Ippolito. Furthermore, her discharge, along with that of Mrs. Hennessy, was held to be discrimination for their Union sympathies in violation of § 8(a) (3). Finally, he concluded that Nichols had unlawfully refused to bargain with the Union upon request under § 8(a) (5). This finding was predicated on determinations that the Union's letter, received by Nichols on October 27, was a demand for recognition and bargaining; that the appropriate bargaining unit encompassed the employees of Nichols, Spencer and IMAC; and that, on October 27, the union numbered 133 employees, of whom 77—a clear majority—had signed and returned to the Union valid authorization cards. A bargaining order was recommended. The Board affirmed the examiner's decision and recommended or-

der, and now petitions us for its enforcement. For the reasons given below, we have concluded that enforcement should be granted.

There is substantial evidence on this record, considered as a whole, to support the examiner's finding that Nichols violated § 8(a) (1) and (3) of the Act. See Universal Camera Corp. v. N.L.R.B., *supra*, 340 U.S., at 487–488, 71 S.Ct. 456.

The credited testimony on the subject of the group meetings indicated that Nichols unlawfully attempted to persuade those employees who had signed cards to revoke them. See N.L. R. B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (6th Cir. 1964). Questioning of individual employees designed to elicit information about the activities of Union organizers and the sympathies of co-workers was not permissible interrogation. See N. L. R. B. v. Elias Brothers Big Boy, Inc., *supra;* N. L. R. B. v. S. S. Logan Packing Company, 386 F.2d 562 (4th Cir. 1967). And the various statements which Jones made to Mrs. Ippolito were unlawful, not only as creating an impression of surveillance, see N. L. R. B. v. S. S. Logan Packing Company, *supra,* but also as constituting an implied threat of discharge for Union activity, see N. L. R. B. v. Marsh Supermarkets, Inc., 327 F.2d 109 (7th Cir. 1963), cert. den. 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964), and an actual threat of plant closure, see N. L. R. B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. den. 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965). We agree with the Board that these acts interfered with, restrained, or coerced the employees in the exercise of their rights, in violation of § 8(a) (1).

As for the alleged violation of § 8(a) (3), respondents and the Union introduced sharply conflicting testimony concerning the reasons for Mrs. Ippolito's and Mrs. Hennessy's discharge. The trial examiner discredited Nichols' assertion that they were let go as part of the normal post-Christmas layoff and that Mrs. Ippolito had exhibited "incom-

patibility" and "bad attitude" and Mrs. Hennessy a habit of smoking in prohibited areas.[4] He found that both had been satisfactory employees and that Nichols, knowing of their Union sympathies, had fired them for that reason. We accept such a finding since it is based on assessments of credibility. Also, the Board was entitled to infer that the justifications offered by Nichols do not have the ring of truth.

For example, such explanations as were given to Mrs. Ippolito and Mrs. Hennessy at the time of their discharge were lacking in logic and consistency. Each had begun work for Nichols-Dover when it opened in the summer of 1965. From initial assignments on the main floor of the store, they had advanced by late summer 1966 to positions in the office which entailed increased responsibilities, including the occasional training of other employees. On December 28, 1966, however, both were terminated with the explanation that they were being laid off because the Christmas rush was over. Yet neither had been hired on that account. Indeed, several store workers with less seniority were retained and 29 new employees were hired during the first three months of 1967. Nevertheless, the "layoffs" of Mrs. Ippolito and Mrs. Hennessy were not made subject to recall, nor were they ever reoffered jobs by Nichols. Moreover, the Board was entitled to infer that the revised justifications later offered at the hearing—Mrs. Ippolito's "bad attitude" and Mrs. Hennessy's smoking—bear the hallmarks of after-thought.[5] Thus, conflicting testimony was given as to whether either was warned, while an employee, of her alleged misbehavior. And Nichols officials were vague when asked to describe specific instances of complaints about them by customers. Questioned as to why in the past Mrs. Ippolito had been promoted instead of discharged for her alleged attitude, Jones was unable to reply. Regarding Mrs. Hennessy, there was testimony that smoking regulations were frequently disregarded, not only by other employees but by members of the managerial staff as well. The Board was justified in concluding that the discharges of these two employees were discriminatory under § 8(a) (3) of the Act.[6]

We pass finally to the question of whether there was a § 8(a) (5) refusal to bargain here, and, if there was, what the appropriate remedy should be. Fortunately, we have the benefit of a recent Supreme Court decision involving facts very similar to the instant case and presenting this legal issue. N. L. R. B. v. Gissel Packing Co., Inc., et al., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (6/16/69). There Chief Justice Warren, speaking for a unanimous Court, reaffirmed the use of authorization cards as an acceptable means of creating representative status and a duty to bargain. His opinion also sanctioned the bargaining order as a remedy for an employer's failure to undertake such duty, if he instead "* * * committed independent unfair labor practices which * * * made the holding of a fair election unlikely * * *."

4. Cephas, a former assistant manager called by the General Counsel, testified that Mrs. Ippolito was lazy, disobedient, and irritable, and that customers had complained about her. He also testified that Mrs. Hennessy was difficult in passing on refund claims, that he had seen her smoking in forbidden areas, and that he had asked her to stop. However, the examiner noted that this witness had reasons for bias at the time of his testimony.

5. A similar inference was appropriate concerning the other justification offered to Mrs. Ippolito at the time of her discharge by the assistant manager, who apparently was commissioned by Jones to notify her: "if you want a reason, incompatability".

6. We think this conclusion is warranted by the record even without the testimony of Cephas, who related that a store official had told him, a week before the fact, that Mrs. Ippolito and Mrs. Hennessy were to be fired on account of their Union activities. Cephas had himself been suddenly discharged by Nichols shortly before the hearing, but, despite his "strong motivation * * * to consciously or unconsciously make a case against his employer", the examiner credited his testimony on this point.

In the instant case, we agree with the Board's conclusion that the Union's letter, received by Nichols on October 27, 1966, constituted an unambiguous demand for recognition and bargaining. Nichols' November 1 response, declining to bargain and suggesting an election, was, without more, a permissible response to that demand.[7] However, instead of proceeding to an election, Nichols embarked upon the unfair labor practices described above, which, at the very least, had a "tendency to undermine majority strength and impede the election processes." 89 S.Ct. at p. 1940. The Supreme Court makes clear in *Gissel* that this type of response by an employer constitutes a § 8(a) (5) refusal to bargain for which a bargaining order is an appropriate remedy.[8]

Remaining for discussion is Nichols' contention that the Union lacked a valid majority of employees in the appropriate bargaining unit as of the date of the demand for recognition. The trial examiner determined that the appropriate unit should include employees of Nichols and its licensees, Spencer and IMAC.[9] Within this unit, he specifically found qualified as employees the two previously discharged discriminatees who had been held entitled to reinstatement,[10] four part-time workers, and one individual whose status as an employee on the date of demand for recognition was in dispute. Such discretionary determinations are peculiarly within the Board's expertise and we decline to interfere with them here.[11] See Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); N. L. R. B. v. Sun Drug Co., 359 F.2d 408, 412–413 (3rd Cir. 1966); N. L. R. B. v. J. W. Rex Co., 243 F.2d 356, 359 (3rd Cir. 1957).

This unit numbered 132 employees on October 27, 1966, on which date, the Board found, the Union held 72 valid au-

7. *Gissel* states that present Board policy, left undisturbed by the Supreme Court in that decision, is that "[w]hen confronted by a recognition demand based on possession of cards allegedly signed by a majority of his employees, an employer need not grant recognition immediately, but may * * * decline the union's request and insist on an election * * *." 89 S.Ct., at p. 1928. Nor is he "obligated to accept a card check as proof of majority status * * * and he is not required to justify his insistence on an election by making his own investigation of employee sentiment and showing affirmative reasons for doubting the majority status." *Id.* at p. 1937.

8. Employee turnover in the Nichols store since October 1966 would not affect the power of the Board to issue a bargaining order at the present time. See *Gissel*, *supra*, 89 S.Ct. 1918,. and cases there cited.

9. Respondents contend in their brief that Nichols had a good-faith doubt as to the proper inclusion of Spencer and IMAC in the unit, apparently on the theory that such a doubt would prevent a finding of a § 8(a) (5) refusal to bargain. Under current Board policy, however, as described by the Supreme Court in *Gissel*, an employer's good-faith doubt is largely irrelevant; he "can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct * * *." 89 S.Ct., at p. 1930. In addition, we note that Nichols failed to mention the appropriateness of the unit in its letter of November 1, 1966.

10. See footnote 2.

11. We note that ingress to areas operated by Spencer and IMAC is controlled by Nichols, so that they are open only during Nichols store hours. Also, Spencer and IMAC do not advertise on their own, or display any signs to apprise the public that they are under separate control. Snack bar employees use many of the same facilities as Nichols personnel, including the time clock, parking areas, and restrooms. They apply for positions through the Nichols office, receive a Nichols handbook of rules and regulations, and are entitled to a discount on Nichols purchases. Moreover, the record supports the Board's finding that Store Manager Jones influenced labor relations and other aspects of the Spencer and IMAC operations.

It is noted that the unfair labor practice proceeding involving Nichols' Elmira, New York, store, see footnote 2, also resulted in a determination that employees of that store's licensees were properly included in the bargaining unit. See 380 F.2d at 439, cited at footnote 2 above.

thorization cards.[12] Nichols attacks the cards on a variety of grounds. The contentions that five cards were obtained by misrepresentations, that a "majority" of the other employees had signed or that no initiation fee would have to be paid (R. brief, pp. 11–13, 15–16), were resolved on the basis of a determination, which is supported by the record, that no substantial misrepresentations were established by the evidence. The claim that seven cards were effectively revoked (R. brief, pp. 17–23) is rebutted by the fact that the efforts of Nichols management to procure the revocations were themselves violative of § 8(a) (1). See N. L. R. B. v. Quality Markets, Inc., 387 F.2d 20, 24 (3rd Cir. 1967). Finally, two cards are questioned on the ground that they were falsely represented to be for the purpose of an election (R. brief, pp. 13–15). The Supreme Court's *Gissel* decision resolves this issue. It approved the Board's *"Cumberland* rule," under which an unambiguously phrased card [13] will be counted unless it is proved that the employee was told it was to be used *solely* for the purpose of obtaining an election. 89 S.Ct., at p. 1936. The Court further pointed out that:

"* * * employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election."

As we read the record, it would be difficult to maintain that the two Nichols employees were even told of the probability of the cards' use to get an election, let alone that they should disregard the language of authorization entirely. We therefore find valid the Board's conclusions that the Union had a majority when it demanded recognition on October 27, 1966, that Nichols refused to bargain under § 8(a) (5) by attempting to undermine this majority, and that a bargaining order is a proper remedy.

Since the Board may desire to consider its remedial bargaining order in the light of *Gissel, supra,* 89 S.Ct. 1918, the cause will be remanded to the Board so that it may be afforded an opportunity to do so.[14]

12. Payroll records showed that on that date Nichols had 117 employees, Spencer had 3, and IMAC had 11. The two previously discharged employees held entitled to reinstatement brought the total to 133. However, the Board in its decision found it unnecessary to pass on the validity of the authorization cards of five employees (which were accepted by the trial examiner), among whom four were claimed to have falsely predated their cards and one was alleged not to have been an employee when she signed her card. The Board explained that these five cards were not necessary to the Union's majority status. In view of our disposition of the various other challenges to the cards advanced by respondents, we need not consider these cards' validity. However, it seems unfair to put aside as unnecessary a determination as to whether the card of a disputed "employee" should be counted, and then count the employee toward the total number in the unit. Accordingly, though it affects not our decision, we have construed the bargaining unit here as numbering 132 employees on October 27, 1966.

13. There is no contention in the instant case that the cards could be understood to authorize the Union to do anything other than represent the employees for collective bargaining purposes.

14. The July 1, 1969, letter from counsel for the Board suggests such a procedure.