HEDSTROM COMPANY, a subsidiary of Brown Group, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–1700.

United States Court of Appeals, Third Circuit.

Argued Jan. 14, 1977.

Decided July 5, 1977.

Nicholas Unkovic, W. D. Armour, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Howard E. Perlstein, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Aileen A. Armstrong, Jane P. Schlaifer, N. L. R. B., Washington, D. C., for respondent.

Before ROSENN and HUNTER, Circuit Judges, and COOLAHAN, Senior District Judge.*

## OPINION OF THE COURT

COOLAHAN, Senior District Judge.

Hedstrom Company, a subsidiary of Brown Group, Inc. (hereinafter Hedstrom or the Company), petitions this Court, pursuant to 29 U.S.C. § 160(f), to review, modify, or set aside the National Labor Relations Board's finding of violations of §§ 8(a)(1) and (5), National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5) (1970), and for an order vacating the National Labor Relations Board's May 12, 1976, order to bargain.[1] The National Labor Relations Board (hereinafter the Board) cross-petitions for an order of enforcement.

---

* James A. Coolahan, United States Senior District Judge for the District of New Jersey, sitting by designation.

1. *Hedstrom Company, a Subsidiary of Brown Group, Inc., Bedford, Pa. and International Association of Machinists and Aerospace Workers, District 98, AFL–CIO,* Case No. 6–CA–7619 and No. 6–RC–6762, 223 NLRB No. 211, 92 LRRM 1297 (1976).

**1140**

The Board found that Hedstrom violated § 8(a)(1)[2] of the National Labor Relations Act (hereinafter the Act) by coercively interrogating and threatening employees, unlawfully soliciting employee grievances, creating the impression of surveillance, promising and granting benefits to employees, and threatening employees with plant closure in the event they elected the union, in an attempt unlawfully to interfere with employee organizational rights protected by § 7 of the Act.[3] The Board also sustained the union's objections to the March 28, 1974, election. In addition, the Board found that the Company violated § 8(a)(5) of the Act[4] by refusing to recognize and bargain with a majority status union. The Board found that the Company's unfair labor practices were so pervasive as to preclude the possibility of a fair election to determine whether the employees desired the International Association of Machinists and Aerospace Workers, District 98, AFL–CIO, as their collective bargaining agent. Consequently, the Board issued an *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), bargaining order. For the reasons stated below we enforce in part and deny enforcement in part; we vacate that portion of the Board's order which requires the Company to bargain, and remand this case for proceedings consistent with this opinion.

**2.** Section 8(a) of the Act, 29 U.S.C. § 158 (1970), reads:

"(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

**3.** Section 7 of the Act, 29 U.S.C. § 157 (1970), reads:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

**4.** Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) (1970) reads:

Hedstrom Company, a Delaware corporation with four plants located throughout the country, engages in the manufacture and non-retail sale of juvenile toys and furniture. The plant in which the alleged unfair labor practices occurred is located in Bedford, Pennsylvania. This company branch had been located in Fitchburg, Massachusetts, until 1966 when the Company decided to relocate its plant and corporate headquarters in Bedford. While in Fitchburg, company employees were represented by the United Furniture Workers of America, AFL–CIO. That union engaged in a 13-week strike at Hedstrom's Fitchburg plant, which contributed to the Company's decision to relocate. Hedstrom's Bedford plant has been nonunion since it opened in 1966. Several unionizing attempts were unsuccessful due to a lack of employee support as evidenced by insubstantial pro-union election votes.[5] However, the most recent unionizing campaign, which gave rise to the instant proceeding, proved more successful. It was started in late January, 1974, by some company employees who expressed an interest in representation by the International Association of Machinists and Aerospace Workers, District No. 98, AFL–CIO (hereinafter the Union).

"It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

**5.** Two previous unionizing efforts resulted in elections, and one did not. The first election (6–RC–4628) was held on April 2, 1968, in which the Furniture Workers International received only one vote and Local 453 of the International Brotherhood of Teamsters, Chauffeurs and Helpers of America received 54. There were 119 ballots marked neither. Objections to the election were overruled. On October 15, 1970, another election (6–RC–5576) was held in which the International Union of District 50, Allied and Technical Workers of the United States and Canada failed to receive a majority. No objections were made to this second election. There is no record of the vote.

On February 5, 1974, union representative Jesse Young conducted an organizational meeting at the Holiday Inn in Bedford, which was attended by 35 company employees. All but one employee present signed union authorization cards at that meeting. A few days later additional union authorization cards were signed and turned over to Young. On February 12 the Union by letter requested that the Company recognize it as the collective bargaining representative for Hedstrom's Bedford production and maintenance employees.[6] Two days later company president E. Lee (Jack) Ketcham, Jr., in response to the Union demand, suggested that the Union file a representation petition with the Board.

On February 21 the Union filed its petition with the Board.[7] Pursuant to a stipulation for certification upon consent election,[8] an election was held on March 28. The vote was 113 for the Union and 125 against it, with three void ballots. On April 2 the Union filed with the Board objections to conduct on the part of company management personnel which allegedly destroyed laboratory conditions necessary for an election.

The Union in its objections to the election charged that (1) company management, along with the Bedford Gazette, a local daily newspaper, and the Industrial Development Commission,[9] threatened, intimidated, and coerced Hedstrom employees, thereby interfering with laboratory conditions; (2) company president Ketcham in an election-eve "captive audience" speech conveyed the impression that if the Union won the election, the Company would move from Bedford; (3) the Bedford Gazette conveyed

this same threat, and implied that plant expansion hinged on the outcome of the election. Appendix 28a. Only the second objection was alleged as an unfair labor practice in violation of § 8(a)(1). On July 8, 1974, the Regional Director of the Board issued an order directing a hearing on the Union's objections. Subsequently, on July 12, 1974, the Union filed unfair labor practice charges against the Company, alleging that management personnel waged an anti-union campaign by coercively interrogating and threatening employees, unlawfully soliciting grievances, creating the impression of surveillance, and by promising and granting benefits to employees. After hearings on the Union charges and objections, the Administrative Law Judge (A.L.J.) rendered his decision on November 19, 1975, finding certain § 8(a)(1) violations. He sustained three union objections to the election and recommended that the election be set aside and another held. He also issued a cease-and-desist order. He did not find that the Union had a card majority. The A.L.J. concluded that a bargaining order was unnecessary. By a vote of 2 to 1, Chairman Murphy dissenting, the Board reversed the A.L.J.'s finding of no § 8(a)(1) violation with respect to an alleged threatening conversation between company president Ketcham and an employee named Norman Anderson, but sustained all other § 8(a)(1) findings. The Board found, consistent with the finding of the A.L.J., that president Ketcham's election-eve speech was coercive. The Board also found, contrary to the A.L.J., that the Union had obtained a card majority which was dissi-

---

6. This particular bargaining unit consists of 249 employees and is an appropriate unit within the meaning of the Act.

7. The Union incorrectly stated in its petition that the employer had not replied to its February 12 letter. Jesse Young testified that he was not sure whether the Union received the Company's reply before or after the Union petitioned for an election. Appendix, 64a.

8. The stipulation was entered into by the employer and the Union along with the United Steelworkers of America on March 6. The Regional Director notified all parties by letter

on March 19 that the United Steelworkers of America withdrew its name from the ballot.

9. The Industrial Development Commission (hereinafter the Commission) of Bedford brought Hedstrom to Bedford in 1966. The Regional Director of the Board did not allege that the Commission had committed a § 8(a)(1) violation. He alleged, however, that the Commission interfered with laboratory conditions. The Administrative Law Judge sustained the Regional Director's objections to the election. The Board affirmed.

pated by employer unfair labor practices and, consequently, issued an order to bargain. Hedstrom petitions for an order denying enforcement of the Board's order and respondent cross-petitions for enforcement.

## § 8(a)(1): UNFAIR LABOR PRACTICE CHARGES

The Union charged the Company with approximately 41 separate § 8(a)(1) unfair labor practices. Most of these charges accuse lower-level management personnel of interfering with employee § 7 rights. However, some of the charges allege that the company president and the plant manager also committed § 8(a)(1) unfair labor practices. The Board [10] found that the Company had engaged in an active and pervasive anti-union campaign immediately following the Union's initial organizational meeting held at the Holiday Inn on February 5.

Petitioner concedes that it committed § 8(a)(1) violations.[11] However, petitioner characterizes these violations as fairly innocuous. Its position is that its conduct did not make a fair election impossible.

Inasmuch as petitioner concedes most of these unfair labor practices, we need not review in detail the evidence and law supporting the Board's findings, except insofar as they are germane to our discussion of the

appropriateness of the Board's order to bargain. The A.L.J. found that most of the unfair labor practices taken alone would not have disturbed the laboratory conditions necessary for a fair election; taken together, however, they did destroy laboratory conditions.

■ The A.L.J. found that after the Union held its first organizational meeting, William Griffiths, the Company's plant manager, began to solicit employee grievances in order to dissuade pro-union votes.[12] The A.L.J. also found that Griffiths made specific promises to the employees to give them the impression that a union was not needed. He told employees to file their grievances with him and he would remedy them if meritorious. He told some employees that he was capable of running the plant without outside interference, more or less, without a union.

■ Griffiths admitted talking to the employees about their union sympathies. In some instances Griffiths asked the employees to support the Company in the forthcoming election. He told several employees that they did not need a union. The A.L.J. found this questioning constituted coercive interrogation designed to per-

**10.** The Board adopted most of the A.L.J.'s findings of fact. Therefore, a reference to the A.L.J.'s findings should be understood to be consistent with those of the Board and vice versa, unless the contrary is stated.

**11.** At oral argument, Judge Rosenn asked petitioner if it seriously disputed the claim of § 8(a)(1) violations. Counsel for Hedstrom answered, "[n]o, I cannot." Petitioner does contend, however, that the "alleged" threat to fire Norman Anderson was not a violation of § 8(a)(1). Petitioner also disputes the allegations raised in the objections to the election, including the allegation that president Ketcham's election-eve speech was violative of § 8(a)(1).

**12.** Griffiths testified that anti-union animus did not motivate his extensive grievance solicitation program. He claimed that he acted pursuant to president Ketcham's directive issued the day before the Union's first organizational meeting. The A.L.J. found to the contrary and the Board affirmed. We note that as the A.L.J. considered all relevant factors and sufficiently

explained his credibility resolution, we may not disturb his determination. *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 241 n. 3 (3d Cir. 1976). *See, Altemose Construction Co. v. NLRB,* 514 F.2d 8, 16 (3d Cir. 1975); *NLRB v. Erie Marine, Inc.,* 465 F.2d 104, 106 n. 3 (3d Cir. 1972); *Standard Dry Wall Products, Inc.,* 91 NLRB 544, 545 (1950), *enforced,* 188 F.2d 362 (3d Cir. 1951).

We also note that though the solicitation of grievances is not in and of itself an unfair labor practice, it becomes one in violation of § 8(a)(1) when the grievance solicitation is accompanied by an express or implied promise to remedy the grievance if the Union is rejected, or if such promise otherwise serves as an inducement to vote against the Union. *See, Landis Tool Co., Division of Litton Industries v. NLRB,* 460 F.2d 23, 24–25 (3d Cir.), *cert. denied,* 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972). The Board found that the solicitation of grievances in this case was accompanied by implicit or explicit promises of benefit and was, therefore, violative of § 8(a)(1).

suade employees not to vote for the Union.[13]

The A.L.J. found that Griffiths granted an employee named Gary Figard an immediate benefit in order to discourage him from voting for the Union. Griffiths asked Figard what he thought about the Union. When Figard told Griffiths that he had not yet made up his mind, Griffiths solicited his grievances. Figard told Griffiths he needed a jog button on his automatic press. He said he would also like to have his pay rate stabilized. The next day Figard was placed on straight pay, which had the effect of stabilizing his rate, and remained on it until November, after the election, when other employees complained about his preferential status. Within three days a jog button was placed on his automatic press.[14]

■ Griffiths told one employee, who was as yet undecided about the way he should vote, that the building would not be worth much without the Company.[15] This the A.L.J. found was an implied threat to close the plant in the event the Union won the election.[16]

The A.L.J. concluded that Hedstrom, in the person of William Griffiths, "violated Section 8(a)(1) of the Act by interrogating employees about their union activities, membership, and desires, by soliciting their grievances, and promising and granting them improvements in their working conditions, and by threatening to close the plant, in order to deter them from selecting the Union as their collective-bargaining representative." Appendix, 12a.

■ Similarly, the A.L.J. found that lower-level management pursued a policy of grievance solicitation and employee interrogation about union sympathies. In many of these cases, however, the employees who were questioned wore union badges or were known union supporters. This was true as well of some of the employees with whom Griffiths spoke. Nonetheless, some uncommitted or undecided employees were approached and interrogated on these matters. The lower-level supervisors interrogated employees about their union membership and conveyed the threat that if the Union won the election, the employees would lose their benefits, and the Company might enforce its rules more strictly.[17]

13. It is a violation of § 8(a)(1) for an employer to interrogate employees about their union sympathies when doing so suggests to the employees that the employer may take action against them because of their pro-union sympathies. *See, NLRB v. Clapper's Manufacturing, Inc.,* 458 F.2d 414, 417–418 (3d Cir. 1972); *NLRB v. S. E. Nichols-Dover, Inc.,* 414 F.2d 561, 563 (3d Cir. 1969), *cert. denied,* 397 U.S. 916, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970). In *NLRB v. Camco, Inc.,* 340 F.2d 803, 804–805 n. 6 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965), the court noted that the test is not whether the employees were actually coerced, but whether the questioning tended to be coercive. *See, NLRB v. Colonial Knitting Corp.,* 464 F.2d 949, 951 (3d Cir. 1972); *NLRB v. Barney's Supercenter, Inc.,* 296 F.2d 91, 94–95 (3d Cir. 1961).

14. Griffiths testified that these benefits were not conferred to encourage Figard to vote against the Union. The A.L.J.'s credibility finding considered all relevant factors, and he sufficiently explained his credibility resolution. We may not disturb his finding. *See,* n. 12, *supra.*

As the Supreme Court noted in *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), the law prohibits employer "conduct immediately favorable to

employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect."

15. Griffiths denied this statement. The A.L.J.'s credibility findings were properly supported, and we pay deference thereto. *See,* n. 12, *supra.*

16. It is clear that promises of benefit or threats of reprisal to discourage union votes are violative of § 8(a)(1). *See, e. g., Carlisle Paper Box Co. v. NLRB,* 398 F.2d 1, 4–5 (3d Cir. 1968). *See also, NLRB v. Armcor Industries, supra,* 535 F.2d at 242–243; *NLRB v. Frank C. Varney Co.,* 359 F.2d 774, 775 (3d Cir. 1966).

17. Statements which threaten loss of benefits if the Union wins the election and which are not carefully phrased to demonstrate that the statement is merely a prediction based on objective fact are violative of § 8(a)(1). *See, NLRB v. Erie Marine, Div. of Litton Industries,* 465 F.2d 104, 106 (3d Cir. 1972); *NLRB v. Marsh Supermarkets, Inc.,* 327 F.2d 109, 111 (7th Cir. 1963), *cert. denied,* 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964); *NLRB v. Barney's Supercenter, Inc.,* 296 F.2d 91, 94–95 (3d Cir. 1961).

Supervisor Randy Whetstone, a former union steward in Fitchburg, told one employee that the union in Fitchburg stifled Company growth there. He told another employee that two Fitchburg employees started the 13-week wildcat strike so that they could see the World Series. He promised employee Alfred Wertz a better job if he voted against the Union. The A.L.J. found these statements were coercive of employee § 7 rights.

Another supervisor, Inda Logue, told employee Thomas Lewis that he should give the Company a chance because "You don't want to be standing out in a picket line half of the winter." Appendix, 110a. She warned other employees that if the Union won the election, it would strike.

■ Supervisor Robert Will was found to have conveyed the impression of surveillance of employee concerted activity when he asked employee Michael Hilmer why on the day he reported sick from work, he showed up at a union meeting.[18] Hilmer, however, answered unresponsively that he would make up his own mind about the Union. Other supervisors were found to have committed similar unfair labor practices.

In the objections to the election, there was an unfair labor practice charge made against president Ketcham for impliedly threatening, in his election-eve speech, to close the plant if the Union won the election.[19] At 10:00 p. m. on March 26, president Ketcham had delivered an election-eve speech to the night, or second, shift, and on March 27 he delivered the same speech before the morning, or first, shift.[20] The A.L.J. found that Ketcham did not deviate, except for some opening pleasantries, from his prepared text, which was admitted into evidence.[21] Appendix, 402a–427a. Ketcham noted in his speech that this was the third representation election in 7½ years. He reviewed the Company's record and listed its benefits. He also talked about the Company's plans for growth. He related that there was 18% unemployment in Bedford County according to one newspaper. He added, "Right now, Hedstrom is hiring—*your Company's prosperity is your best job security.*" Appendix, 420a. Ketcham enumerated six reasons why the Company opposed the Union. In the fifth reason, he said:

"This Company has already had experience with a union—in Fitchburg. It was an *unhappy experience* for us, and we honestly think it was for our hourly employees also. Unions aren't always what they are cracked up to be." (Emphasis added.) Appendix, 426a.

The A.L.J. found that Ketcham in his speech did impliedly threaten to close the plant if the Union won the election. In arriving at this finding, the A.L.J. considered the fact that the entire community of Bedford, especially those in the plant, were aware that Hedstrom left Fitchburg to avoid the union. Therefore, the A.L.J. observed, everyone in the room knew what Ketcham meant by the "unhappy experience." The A.L.J. said (Appendix, 7a):

"It is no wonder that, by the time of the hearing, the employees were remembering a specific statement by Ketcham that they now had the jobs formerly held by Fitchburg employees because of the

---

**18.** Surveillance which suggests coercion, or which inhibits the exercise of § 7 rights, violates § 8(a)(1). *See, e. g., NLRB v. Armcor Industries, Inc., supra,* 535 F.2d at 242–243; *NLRB v. Clapper's Manufacturing, Inc., supra,* 458 F.2d at 417–418; *NLRB v. S. E. Nichols-Dover, Inc., supra,* 414 F.2d at 563.

**19.** The three objections to the election can be distilled to two allegations, only one of which charges a violation of § 8(a)(1). The other charges that the election-day editorial of the Bedford Gazette helped undermine the laboratory conditions necessary for a free election.

**20.** The A.L.J. found that Ketcham delivered these speeches more than 24 hours before the election so as to comply with the Board's *Peerless Plywood Company,* 104 NLRB 427 (1953), rule, which prohibits election speeches to mass assemblies of employees within 24 hours of an election. The parties do not dispute this.

**21.** His credibility findings were based on a consideration of all relevant factors and sufficiently explained. We, therefore, may not disturb them. *See,* n. 12, *supra.*

latter's unhappy experience with a union, even though those were not the precise words Ketcham used. That was the message Ketcham intended to convey by the words he did use. 'Unhappy experience' became 'bitter experience' in the employees'˙ memories because that was the phrase placed in the mouth of an unidentified manager of the plant by the Bedford Gazette. An allusion to the loss of jobs in Fitchburg became a specific statement by Ketcham because they got the message Ketcham intended to send them. I find, therefore, that when Ketcham stated the fifth of [Hedstrom's] six reasons for not wanting a union in Bedford, [Hedstrom] impliedly threatened to close the plant in the event its employees selected the Union as their collective-bargaining representative, thereby violating Section 8(a)(1) of the Act." [22]

■ All of the foregoing violations as found by the A.L.J. were affirmed by the Board. In light of petitioner's concessions with respect to most of these particular § 8(a)(1) unfair labor practices, see fn. 11, we need merely note that the Board's findings of § 8(a)(1) violations are supported by substantial evidence in the record as a whole, 29 U.S.C. § 160(e) (1970); see, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Armcor Industries, Inc., supra, 535 F.2d at 242; Mon River Towing, Inc. v. NLRB, 421 F.2d 1, 9–10 (3d Cir. 1969).

■ However, we do not find substantial evidence in the record as a whole to support the Board's conclusion that Ketcham threatened to fire employee Norman Anderson in violation of § 8(a)(1).[23] The Board, by a 2 to 1 vote with Chairman Murphy dissenting, reversed the A.L.J.'s finding of no § 8(a)(1) violation with respect to the conversation between Ketcham and Anderson. The A.L.J. rejected Ketcham's version of the facts, and relied on Anderson's version. He found, nonetheless, that in view of the cordial nature of the conversation and the setting, Anderson would not have been coerced.

■ The testimony demonstrates that on March 16, 1974, twelve days before the election, the Company held its periodic dinner-dance at the Bedford Elks Club.[24] During this affair, Ketcham talked with Anderson, a press operator, late in the evening at the bar. Ketcham knew Anderson personally. The two men discussed Anderson's personal life and some of his troubles. They discussed deer hunting, softball, and Anderson's family. According to Anderson, Ketcham asked him what his biggest "gripe" was. Anderson replied that it was that he was losing money under the incentive system every time the Company installed a new piece of equipment. Anderson admitted that the conversation was informal and friendly.

Anderson testified that Ketcham told him that he "could run the Company with or without a damn union; and then, he [Ketcham] said that if he had been president of the Company the first three times that this union was brought up, he would have fired my f_____ ass." Appendix, 83a. Ketcham told Anderson that he was an abrasive sort who was always kidding everyone. Anderson's testimony on cross-examination did indicate that he and Ketcham were on friendly terms and that they socialized together. Appendix, 85a. Anderson's wife sat at Ketcham's table with Ketcham's wife at the dinner-dance. He also admitted that Ketcham did counsel him in a fatherly way and urged him to have more self-confidence. He added that Ketcham told him whether he was for the Union or not was his own business. Ketcham assured Anderson that he was judged only on what he did, and that was excellent. Appendix, 321a.

The A.L.J. found:

<hr>

22. See, fn. 21.

23. It is a violation of § 8(a)(3) of the Act to discharge an employee because of his union activity. No discharge occurred and no § 8(a)(3) violation was charged.

24. Neither the A.L.J. nor the Board found that the dinner-dance was timed to affect the election.

". . . Ketcham did not ask Anderson about his gripes in order to solicit his grievances. The incentive system came up as two men talked shop. They had shed, at least for a few hours, their roles as boss and worker. They were communicating with each other as equals under social, not plant, conditions. Ketcham did not warn Anderson that he was in danger of being fired because of his pro-union stance in the current campaign. On the contrary, Ketcham was making the precise point that, while Anderson's abrasive personality might have gotten him into trouble during earlier union drives, he had nothing to worry about this time with Ketcham in charge of [the Company]." Appendix, 8a.

The Board reversed the A.L.J.'s finding. It held that notwithstanding the nature of the conversation, the comment was a threat to discharge Anderson if he engaged in union activity. It found the threat to fire Anderson was given emphasis by the vulgar epithet. Chairman Murphy dissented for the reasons stated in the A.L.J.'s opinion and because the majority had failed to place the comment in the context of a frank and candid discussion.[25] Any threat that might have been conveyed by Ketcham's remark, that had he been president the last three times the employees tried to unionize, he would have fired Anderson, was totally removed by his explicit assurance that Anderson was judged solely on his work, which

was excellent. The Board, we believe, unduly emphasized the "vulgar epithet." It is not unusual for two men drinking at a bar to use such expressive, vulgar language. In the context of the circumstances, the friendly rapport the two had, and the assurances given, it is clear that there is not substantial evidence in the record as a whole to support the Board's finding that the conversation violated § 8(a)(1) of the Act.[26] Consequently, we cannot sustain that portion of the Board's order which relies upon that determination.

## § 8(a)(5): UNFAIR LABOR PRACTICES

The Board reversed the A.L.J.'s decision not to permit the amendment of the complaint to include a § 8(a)(5) charge.[27] The Board then found that the Company violated § 8(a)(5) by refusing to recognize and bargain with a majority status union. We cannot sustain the Board's finding of a § 8(a)(5) violation.

Respondent concedes that the Union did not represent a majority of the employees in the unit on February 12, 1974, the day it sought recognition from the employer. See, respondent's brief, p. 44 n. 7. Respondent contends that the employer's duty to recognize the Union's claim of majority representation is premised on a "continuing demand" for recognition. The General Counsel argues that once the employer is notified that a union demands recognition and that its demand is continuing, the em-

---

25. The Board in its opinion set forth the Chairman's dissent. "Like the Administrative Law Judge, the Chairman concludes that Ketcham merely meant to inform Anderson that, while in the past the latter's union activities would have prompted his discharge, that no longer was the case even though Ketcham now was in a position to act. The Chairman believes that her colleagues have completely disregarded the frank and candid nature of the two men's conversation in which deceit and rancor clearly played no part, and, more significantly, have divorced the allegedly threatening statement from other remarks of Ketcham, particularly the one assuring Anderson that his continued employment rested solely on his work performance and nothing else." She added that this assurance removed any threatening nature the conversation might otherwise have had. Appendix, 43a n. 7.

26. We note that it is within our province to reverse a Board finding of a § 8(a)(1) violation where "the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

27. The Board found that though the A.L.J. would not permit the Union to allege a § 8(a)(5) violation, all the elements of a § 8(a)(5) violation were fully litigated by the parties. Hedstrom strenuously contested majority status. See, Board opinion, Appendix, 41a n. 2. We believe the Board did not act beyond its authority in considering the § 8(a)(5) charges.

ployer risks a § 8(a)(5) violation if the union sometime thereafter attains majority status and the employer does not recognize and bargain with it. We reject this concept of "continuing demand." Respondent conceded at oral argument that the Company was never notified subsequent to the original recognition demand that the Union had finally attained majority status.

The General Counsel relies most heavily upon *Local No. 152 v. NLRB* 120 U.S.App. D.C. 25, 343 F.2d 307, 310 (1965), where in the District of Columbia Court of Appeals held:

> ". . . An employer violates Section 8(a)(5) when, as here, it rejects a Union's bargaining request made in the honest but mistaken belief that a majority had been obtained, without questioning the Union's representative status, and the Union does obtain a majority shortly after such request."

In *Local No. 152* there was evidence (1) that the union honestly but mistakenly believed it represented a majority of the employees in the unit when it sought recognition, and one week thereafter actually attained majority status, (2) the company responded that it was not interested in talking to the union, (3) the company did not in any manner dispute the union's claim of majority representation, (4) the company ignored the union's demand for recognition, and (5) the union petitioned the Board for an election. The court reasoned that under these circumstances "[t]he Board was justified in construing the Union's conduct described above as a continuing demand for recognition *in circumstances where a formal demand in light of the Company's prior peremptory refusal would have been useless.*" (Emphasis added.) 343 F.2d at 310. Thus the court in *Local No. 152* recognized the concept of "continuing demand" only in cases where there had been a prior peremptory refusal.

In *NLRB v. Kostel Corp.,* 440 F.2d 347, 350–351 (7th Cir. 1971), the court recognized an initially invalid demand as an adequate basis for a "continuing demand," where the company requested that the matter of representation be deferred for more than three weeks during which time the union did in fact reach majority status. The court reasoned that it was unnecessary to require another demand on the deferred date. When the company actually considered the union's claim of majority status, the union did in fact represent a majority of the employees. Consequently, the employer's failure to recognize and bargain at that point could be the basis for a § 8(a)(5) violation.

In *NLRB v. Arkansas Grain Corp.,* 390 F.2d 824, 828 (8th Cir. 1968), the court rejected the District of Columbia Circuit's concept of "continuing demand," saying:

> "We hold that an employer, *irrespective of his motivations,* does not violate Section 8(a)(5) by refusing to recognize and bargain with a union, *if in fact the union at the time of the demand for recognition does not represent a majority of the employees.*" (Emphasis added.)

The court reached this conclusion irrespective of the employer's good faith doubt as to the union's majority, because the employer's motivations were only relevant once in fact majority representation existed.[28] Because there was no valid demand, a fortiori, there could be no "continuing" demand. The court, though rejecting the broader concept of "continuing" demand, did however observe that the facts demonstrated that the union's conduct belied the assertion of an "honest but mistaken" claim of majority status.[29]

In the case at bar, the Union demanded recognition on February 12, when, in fact, it did not represent a majority of the employees in the unit. Unlike the "continuing demand" cases, Hedstrom did respond to the demand, Appendix, 397a, fn. 7, *supra,*

---

**28.** *But see, NLRB v. Gissel Packing Co., supra,* 395 U.S. at 594, 89 S.Ct. 1918.

**29.** The Union's demand for recognition stated that its claim should be construed as "continu-ing." This, the court felt, demonstrated some doubt on the part of the Union as to the validity of its claim.

and did express doubts as to the Union's majority status by suggesting that it seek an election. The recognition demand was not ignored, and the Company did not refuse to talk to the Union about the matter.[30] Nor did the Company put the matter off, as the employer had done in *Kostel.* Therefore, we are not presented with a peremptory refusal case.

■ We cannot accept any concept of continuing demand which requires an employer either to recognize a minority status union, or to risk a § 8(a)(5) violation in the event the minority union attains majority status sometime after the demand, unless it gives renewed notices to the employer that it has attained majority status since the last demand. If an employer were to recognize and bargain with a union which does not represent a majority of the employees in the appropriate unit, it commits an unfair labor practice in violation of § 8(a)(2) which prohibits an employer from aiding any minority union. *International Ladies' Garment Workers' Union, AFL–CIO v. NLRB,* 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). Under circumstances such as appear in this case, if we were to accept the Union's position that its invalid demand should be accepted by the employer because subsequent to the demand, and unbeknown to the employer, the Union in fact achieved majority status, we would force the employer to tread the fine line between § 8(a)(2) and § 8(a)(5). If at the time an initial demand is made, the union lacks majority status, the union must notify the employer when in fact it has obtained a card majority from the employees in order to effectuate a valid demand for recognition. Only after such a valid demand does the employer's obligation to recognize the union arise. Here there admittedly was no valid demand made. We therefore, cannot sustain the Board's finding of a § 8(a)(5) violation.

### THE REMEDY

The Board, contrary to the A.L.J., ruled that a bargaining order was necessary because of the pervasive nature of the unfair labor practices. Our inquiry into the appropriateness of such a remedy must commence with a discussion of *NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

In *Gissel* the Supreme Court formulated criteria for determining when a bargaining order is appropriate. The Court set forth three categories. The first is the "exceptional" case marked by "outrageous" and "pervasive" unfair labor practices. In such cases, despite the absence of majority status, the union would be entitled to a bargaining order where the coercive effects of the unfair labor practices could not be eliminated by traditional remedies. The second category is where the case is less extraordinary and "marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S.Ct. at 1940. The Court continued:

". . . The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of easing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue . . . ." 395 U.S. at 614–615, 89 S.Ct. at 1940.

---

**30.** However, the Union did state in its demand letter of February 12 that it was prepared to offer proof of its majority status. Appendix, 396a.

The third and final category presents the case "of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." 395 U.S. at 615, 89 S.Ct. at 1940.

General Counsel, respondent here, conceded before the A.L.J. that this was not a *Gissel* category 1 case, but urged the A.L.J. to find it a category 2 case.[31] *See,* Appendix, 32a. The A.L.J., however, found:

".  .  . All of the conversations, whether they involved the minor supervisors or Griffiths himself, which did not raise the specter of Fitchburg are trivial by comparison. In and of themselves they do not rise to the level of the *Gissel* [category 2] standard. Do the implied threat to close the plant in Ketcham's election eve speech and the conversations specifically about Fitchburg in which charges were rung on the same theme boost this proceeding into the Supreme Court's second category? I think not." Appendix, 34a.

The Board reversed the A.L.J. and found that this was a second category case. The Board must have found that though the unfair labor practices were not so outrageous and pervasive as to constitute a category 1 case, they were more than minimal and were pervasive. It also found that at some point before the election the Union had attained majority status which the unfair labor practices dissipated. Appendix, 46a.

We begin with the issue of majority status, which is a necessary element of a second category case. The A.L.J. found only 123 valid authorization cards. The Board, in reversing the finding of the A.L.J., found that the Union had obtained 125 valid authorization cards by February 15, which constituted exactly a majority of the 249 employees in the unit. The Board found that the Union's majority grew to 129 valid cards by March 4.[32]

In *NLRB v. Gissel Packing Co., Inc.,* supra, 395 U.S. at 584, 89 S.Ct. at 1925, the Supreme Court observed:

".  .  . Under the *Cumberland Shoe* [*Corp.,* 114 NLRB 1268 (1963), *enforced,* 351 F.2d 917 (6th Cir. 1965), and reaffirmed in *Levi Strauss & Co.,* 172 NLRB 732 (1968), *enforced,* 142 U.S.App.D.C. 337, 441 F.2d 1027 (1970)] doctrine, if the card itself is unambiguous (*i. e.,* states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election."

In fact, the Court recognized that even if the employee were told that his card would be used to get an election first, this would not deprive the card of its validity for representation purposes. The Court said:

".  .  . we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606, 89 S.Ct. at 1936.

However, the Court warned that "trial examiners should not neglect their obligation to ensure employee free choice by a too easy mechanical application of the *Cumberland Shoe* rule. We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, .  .  .." 395 U.S. at 607–608, 89 S.Ct. at 1937.

The card used by the Union in this case was unambiguous in its language,

---

**31.** The General Counsel's position is the same on appeal.

**32.** The Union offered 132 cards at the hearing. The Board in one part of its opinion said that it found 128 valid cards, but its discussion of the cards indicates that it found 129 valid. In either case, the Board found that the Union obtained valid cards from a majority of the employees in the unit.

as the A.L.J. and Board found.[33] We conclude that the Board properly found under the *Gissel* test that at some point prior to the election the Union had attained majority status.[34]

Our next inquiry must be into the nature and extend of the unfair labor practices, and into their past effect upon elections and the likelihood of their recurrence in the future. The A.L.J. found:

"... Almost all of the conversations here were one-on-one. Many can be described as casual. Viewed separately, most of them do not measure up to the coercive level of [an] 8(a)(1) violation. This is especially true of the minor supervisors, that is, everybody below the level of Ketcham, the president, and Griffiths, the top in-plant boss." Appendix, 33a.

The A.L.J. concluded that the Company committed numerous and unisolated unfair labor practices, but he did not find they were "extensive" within the meaning of *Gissel.* The A.L.J. did not explain this distinction. However, he did explain that with regard to the "past effect on election conditions" the testimony of the witnesses weighed against a bargaining order. He said:

"... Generally, they [the employees] pictured themselves as either ignoring the supervisors' efforts to affect them or giving as good as they got in the conversation." Appendix, 33a.

As noted above, the A.L.J. found that the unfair labor practices which did not raise Fitchburg were trivial. Appendix, 34a. Consequently, his characterization of the case, though specifically not stated, was as a *Gissel* category 3 case.

The Board, in reversing the A.L.J., made no specific findings with respect to the past effect or the likelihood of recurrence of these unfair labor practices. It merely indicated that the unfair labor practices were numerous and extensive.

The Board found that the unfair labor practices constituted "pervasive misconduct, directly affecting all of the employees, created an atmosphere hostile to the Union and its adherents and was clearly intended to, and did in fact, dissipate the Union's majority status among the employees." Appendix, 48a. The Board's conclusion was that this case fell into the second *Gissel* category, and a bargaining order was necessary.

As this Court pointed out in *NLRB v. Armcor Industries, Inc., supra,* 535 F.2d at 244, the Board is required to "clearly explicate its reasons for issuing a bargaining order *and include findings as to why a fair election cannot be held."* (Emphasis added.) Judge Rosenn, writing for the majority in *Armcor,* continued:

lost card of Warren Hammar. Though these men were told that their cards would be used to get an election, most were not told that that was the only purpose of their cards. Most of them could not recall who told them their cards would be used to obtain an election. Only Edward Will indicated that he was told by a union adherent that the sole purpose of his signing an authorization card was to get an election. We, therefore, conclude that the Board erred with respect to this card.

We agree with petitioner that the card of Paul E. Turner should be rejected because he was told by the union adherent who solicited his card that it would be used only to get an election. Consequently, of the 129 cards found valid by the Board, we determine that only two were incorrectly counted. We, therefore, conclude that sometime prior to the election the Union had 127, a majority, of the employees designate it as their collective bargaining representative.

---

**33.** The card read:
"YES I WANT THE IAM
I, the undersigned, an employee of (company)

hereby authorize the International Association of Machinists and Aerospace Workers (IAM) to act as my collective bargaining agent with the company for wages, hours and working conditions. It is my understanding that I will be invited to join the IAM." Appendix, 395a.

**34.** Petitioner asks this Court to sustain the A.L.J.'s determinations, arguing that they are based on credibility findings. We conclude, however, that the A.L.J.'s findings were based on his interpretation of the law and the testimony as applied thereto, but not on a weighing of credibility. To the extent that contradictory statements were made by witnesses, we have deferred to the credibility findings of the A.L.J.

The Board found the cards of Clair Black, Richard Cloud, Gary Miller, Robert Roland, and Edward Will to have been valid, along with the

". . . *Gissel* itself contemplates that the Board 'must make "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make "a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.' *Peerless of America, Inc. v. NLRB,* 484 F.2d [1108] 1118 (7th Cir. 1973). *See NLRB v. Gissel Packing Co.,* 395 U.S. at 615–16, 89 S.Ct. [1918] 1940–41 . . . .. In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under *Gissel* is salutary." 535 F.2d at 244.

The Board in *Armcor* had failed to indicate specifically under which of the first two *Gissel* categories it had classified the case. Here, the Board has gone that far, but no further. It has failed to make the findings required by *Gissel* and deemed essential for purposes of appellate review in *Armcor.* In *Armcor,* we remanded the case for specific findings where the Board had merely characterized the unfair labor practices as "extensive and egregious" and "designed to interrupt, thwart, destroy the employees' support of the union, and make the holding of a fair election impossible." 535 F.2d at 244. As in *Armcor,* the Board's findings here have been conclusory.[35]

Both the A.L.J. and the Board placed heavy reliance upon the Bedford Gazette's election-day front page editorial, which they found, though not a violation of § 8(a)(1)[36] disrupted the laboratory conditions necessary for an election.[37] The Board found that the editorial conveyed the threat that if the Union won the election, the Company might move. Additionally, the Board found that the article implied that plant expansion hinged on management victory in the representation election. However, neither the Board nor the A.L.J. assessed what impact the article might have

---

**35.** The Board stated:

". . . Rather, we find that there is little or no likelihood that a second and fair election could be conducted in the face of the extensive and far-reaching unfair labor practices committed by [Hedstrom], and that, hence, a bargaining order is warranted to protect the employees' representational rights." Appendix, 44a.
The Board did not indicate the reasons it concluded a fair rerun election unlikely, nor did it assess the past history of employer interference. The Board found many § 8(a)(1) violations and consequently concluded that the only remedy was a bargaining order.

**36.** "It is not necessary that conduct which interferes with the freedom of choice in an election actually constitute an unfair labor practice." *NLRB v. Tennessee Packers, Inc., Frosty Morn Division,* 379 F.2d 172, 181 (6th Cir. 1967), *cert. denied,* 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1969). *See also, Independent, Inc., d/b/a Daily Advertiser v. NLRB,* 406 F.2d 203, 208 (5th Cir. 1969). Here there was a mere benefit bestowed on the Company by a third party during the election campaign which will not warrant a finding of unfair labor practice. *NLRB v. Mayer,* 196 F.2d 286, 290 (5th Cir. 1952).

**37.** The A.L.J. found (Appendix, 30a–31a):

"I gather from the fact he [the Regional Director] did not allege publication of the story as an unfair labor practice that the General Council concedes that agency must be shown before the activities of some person or institution not obviously associated with an employer can be found to be an unfair labor practice and agrees that, here, there is no showing [Hedstrom] either authorized or ratified the story. Therefore, whether the Bedford Gazette was acting as an agent of [Hedstrom] is not an issue I have to resolve."
However, the A.L.J. in dictum stated that he believed Ketcham was the article's source of the information for the prediction of adverse consequences if the Union won the election. The A.L.J. believed that this could constitute the requisite finding of agency to attribute the article to the Company and thereby provide a basis for a § 8(a)(1) violation. *See, NLRB v. Mayer,* 196 F.2d 286, 290 (5th Cir. 1952).
Edward K. Frear, editor of the Gazette and author of the article, refused to divulge his management source. Ketcham admitted that he was the source for only the information concerning wages and benefits.
There was no specific holding with respect to the Bedford Industrial Development Council, which was also alleged to have disrupted laboratory conditions.

on a fair rerun election. The Board in conclusory terms sustained the Union's objection to the election with respect to it.

Unlike *Armcor*, we only have § 8(a)(1) violations present in the instant case. Though, as the General Counsel has argued, § 8(a)(1) violations in and of themselves may have enough of a disruptive effect on an election to warrant a bargaining order, *see, NLRB v. Arkansas Grain Corp., supra,* 390 F.2d at 830, we have no way of evaluating that absent Board findings. Certainly, the Board has not made "specific findings," nor has it given us "a detailed analysis" of the lingering effect of the unfair labor practices and the likelihood of a fair rerun election.

There are additional reasons for requiring a remand here. First, we have reversed the Board's finding of a § 8(a)(5) violation, and we have also been unable to find substantial evidence to support one of the Company's allegedly more flagrant § 8(a)(1) violations.[38] We also conclude that the Board failed to assess the impact the Gazette article had on the election and the chances for a fair rerun election. In addition we note, as did counsel for the Company, that the unfair labor practices occurred over three years ago. The Board has not considered what effect this passage of time would have on the possibility of having a

fair rerun election. *See, NLRB v. Armcor Industries, Inc.,* 535 F.2d at 246.[39] We cannot conclude that because the Company left Fitchburg, in part to avoid a union, this fact alone justifies a bargaining order. There is no indication that traditional remedies such as cease-and-desist orders, the mailing or the reading of notices to employees during plant time, the posting of notices on Company billboards, or the granting to the Union of access to employees during work time at the plant, or a court injunctive order under § 10(j) (29 U.S.C. § 160(j)) as a last resort, will not remedy the unfair labor practices charged here.[40]

We conclude that all other issues raised are without merit and, therefore, require no discussion. Because the Board has failed to evaluate the unfair labor practices in light of the considerations enunciated in *Gissel,* and in light of our own ruling with respect to certain unfair labor practices, this case will be remanded to the Board for further proceedings consistent with this opinion.

**38.** The Court in *NLRB v. General Stencils, Inc.,* 438 F.2d 894, 902 (2d Cir. 1971), noted:

". . . the Board should explain in each case just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion. Detailed explication of this sort is peculiarly necessary because of the possibility, which has here become an actuality, that a reviewing court will vacate one of the § 8(a)(1) findings on the 'totality' of which the Board relied to justify a bargaining order, and the consequent possible need for a remand unless the court can be satisfied that the error did not affect the command to bargain."

**39.** The record demonstrates that in three previous unionizing attempts at Bedford, the unions seeking to represent Hedstrom employees never successfully demonstrated to the Board unfair labor practices. One previous unionizing attempt did not result in an election. In one of the two elections no objections were even

raised. Only in 1968 is there a record of the union vote, and it demonstrates that the union had been overwhelmingly defeated. *See* fn. 8, *supra.* The present unionizing attempt was significantly more successful, which indicates that with the passage of time Hedstrom employees have become more interested in unionization. Whether this fact would indicate that three additional years may have dissipated the effect of the unfair labor practices and have even added to the Union's strength is a factor to be considered by the Board. *But see, NLRB v. Gissel Packing Co., supra,* 395 U.S. at 611 nn. 30–31, 89 S.Ct. 1918.

**40.** As the Court in *NLRB v. Gissel Packing Co., supra,* 395 U.S. at 602, 89 S.Ct. at 1934, noted:

". . . The Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support."