**BURLINGTON INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC, Intervenor.**

**No. 81–1758.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1982.

Decided June 4, 1982.

McNeill Smith, Greensboro, N. C., J. Hamilton Stewart, III, Greenville, N. C. (Martin N. Erwin, Smith, Moore, Smith, Schell and Hunter and Donald A. Cockrill, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, N. C., on brief), for petitioner.

Richard A. Cohen, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Carol A. De Deo, Washington, D. C., on brief), for respondent.

James J. Brudney, Washington, D. C. (Jeffrey L. Gibbs, Bredhoff & Kaiser, Washington, D. C., Arthur M. Goldberg, New York City, Gen. Counsel, Amalgamated Clothing and Textile Workers Union AFL–CIO, CLC, on brief), for intervenor.

Before HAYNSWORTH, Senior Circuit Judge, and HALL and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

Burlington Industries, Inc. seeks review of the order of the National Labor Relations Board (the Board) finding it in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act (the Act) and requiring it to bargain with the Amalgamated Clothing and Textile Workers Union (ACTWU). The Board seeks enforcement of its order. The issues presented are (1) whether the Board's bargaining order is based on a valid pre-election card majority, (2) whether the discharge of employee Ralph Meadows violates § 8(a)(3) of the Act, and (3) whether the § 8(a)(1) violations are based on substantial evidence on the record as a whole.

This case arises from an unsuccessful representation election involving several labor organizations at Burlington's Kernersville, North Carolina plant. Initially, the Teamsters Union collected 88 union authorization cards from the 151 production and maintenance employees at the plant. The campaign was, however, abandoned by the Teamsters for reasons unimportant in this case. In late April 1979 the Industrial Union Department (IUD) of the AFL–CIO reinstituted a campaign. Al Motley, an IUD representative, told employees that one of two AFL–CIO affiliates, the Rubber Workers Union or ACTWU, would be chosen by the IUD to represent them if enough authorization cards were collected. Motley explained to these employees that the cards were for union representation but that no dues obligations would be incurred. He further stated that if at least thirty percent of the workers signed cards a representa-

tion election could be held. With this explanation Motley sent several employees, Ralph Meadows among them, into the plant to solicit cards. The cards read in part:

> I desire to be represented by a Union which is part of the AFL–CIO and I hereby designate the AFL–CIO and/or its appropriate affiliates as my Bargaining Agent in matters of wages, hours and other conditions of employment.

By May 14, 1979 Motley had obtained 84 cards, sixteen of which had been solicited by Meadows. At a meeting on or about June 1, 1979 Motley announced that the AFL–CIO had chosen ACTWU as the employees' bargaining representative. An election was held on July 20, 1979 resulting in a 73 to 69 vote against unionization. ACTWU thereafter brought this action before the Board claiming that Burlington had violated §§ 8(a)(1) and (3) of the Act and requesting a bargaining order on the strength of the prior card majority. The administrative law judge (ALJ) found 26 violations of § 8(a)(1) and one § 8(a)(3) violation. He rejected ACTWU's request for a bargaining order, finding the cards too ambiguous to constitute an accurate indication of union strength. The ambiguity found was that the cards failed to designate which union the signers were selecting and left that choice to the IUD. The ALJ found that, though ambiguous, the cards were properly solicited. The Board upheld the ALJ's decision on the §§ 8(a)(1) and (3) violations but found no ambiguity in the cards. A bargaining order was, therefore, issued.

## BARGAINING ORDER

 Cards solicited on the explicit or indirectly expressed representation that they are to be used solely for the purposes of obtaining an election cannot be used for a different purpose. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 607–608, 89 S.Ct. 1918, 1936–1937, 23 L.Ed.2d 547 (1969) citing *Levi Strauss & Co.*, 172 NLRB No. 57 (1968). Printed language on cards is determinative of the card's purpose unless it is "deliberately and clearly cancelled by a union ad-

herent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606, 89 S.Ct. at 1936. The ALJ found that cards solicited by Ralph Meadows were solicited for the sole purposes of an election and representation. A reading of Meadows' own testimony clearly leads to a contrary conclusion. Meadows testified that when soliciting cards he told employees that "the cards was [sic] merely formal representations of percentage of people, to bring in a union for an election purpose only." and "that it was just for percentage of the representation inside the plant to ask for an election." Meadows' use of the word representation clearly does not imply that the cards were union representation cards. The representation made by Meadows was that the cards would be used solely for the purpose of obtaining an election. Nothing can be plainer. Meadows' statements clearly cancelled the printed language on the cards.

Because the cards were improperly solicited they cannot be counted in determining whether ACTWU had a pre-election card majority. Removing Meadows' 16 cards from the 84 counted cards, the pre-election total is 68, less than a majority. We, therefore, refuse to enforce the Board's bargaining order. We need not discuss the ambiguity of the cards themselves.

## SECTION 8(a)(3)

On May 12, 1979 Ralph Meadows was called out of the production department pursuant to his job duties. After completing his task he stopped and got a cup of coffee and returned to work through the inspection department. On his way Meadows spoke briefly to an inspection department employee, then to a production department employee before returning to work. This conduct violated a company work rule prohibiting visiting employees in other departments. Meadows had been admonished on the day before the incident to stay in his work area and more specifically to stay out of the inspection department.[1] Meadows, therefore, received a written rep-

---

1. The Board found this restriction to be violative of § 8(a)(1).

rimand for his disobedience. Because the reprimand was Meadows' fourth in a twelve month period he was discharged pursuant to a standing company policy.[2]

Meadows had received eight written reprimands and two verbal counselings during the thirty months preceding the written reprimand which triggered his discharge. Disciplinary action had been taken on at least two occasions for being away from his work area. The ALJ found him to be given to "occasional emotional outbursts, ranting, raving and irrational behavior." Inspection department supervisor Simmons had complained of Meadows' unauthorized presence in the inspection department prior to the organizational campaign.

■ We find this case indistinguishable from *NLRB v. Wix Corp.*, 309 F.2d 826 (4th Cir. 1962) where we found "... an employee paid on an hourly basis ... hardly has the right to go roaming off on his own indulging in his own pleasure and engaging in personal conversation and to ignore with impunity supervisor's instructions to remain in his work area." We emphasized in *Wix* that the complaints about wandering about the plant occurred prior to the employee's union activities. Meadows had been warned just the day before. As long as rules are applied evenhandedly, there is nothing discriminatory about instructing employees to stay out of other departments except as necessary in the performance of their duties. The ALJ's finding that Meadows' trip through the inspection department was work related is not supported by the evidence. The reasons advanced for the written reprimand are, therefore, valid. Where a good cause and a bad cause for discharge exist, "the burden which is on the Board is not simply to discover some evidence of improper motive but to find an affirmative and persuasive reason why the employer rejected the good cause and chose

a bad one. *American Mfg. Assn., Inc. v. NLRB*, 594 F.2d 30, 36 (4th Cir. 1979), *NLRB v. Apple Tree Chevrolet, Inc.*, 608 F.2d 988, 993 (4th Cir. 1979).[3]

■ The good cause/bad cause analysis was never considered by the ALJ or the Board. We, therefore, deny enforcement of the Board's order to reinstate and make whole Meadows.

*Section 8(a)(1)*

■ Some of the twenty-six § 8(a)(1) violations are based on tenuous credibility determinations by the ALJ. As we have stated many times, we are in no position, when viewing the cold record, to evaluate the credibility of witnesses. For this reason, we heavily defer to the ALJ's determinations of witness credibility. *NLRB v. Holly Farm Poultry Industries, Inc.*, 470 F.2d 983 (4th Cir. 1972). We are not, however, required to accept the ALJ's credibility determinations where they are not supported by substantial evidence.

■ Supervisor Watson was discredited when he denied telling employee Meadows that he was being "watched" by management. The basis for crediting Meadows over Watson was the ALJ's feeling that the warning was probably given because the two men were on "friendly terms." There is no basis in the record to support the conclusion that the men were friendly. The Board itself rejected a similar credibility determination in *Plumbers Local 412*, 249 NLRB 715 (1980).[4] Portions of the Board's order dealing with violation number (1) of § 8(a)(1), creating an impression of unlawful surveillance by the warning, will not be enforced.

As stated earlier, as long as rules are applied evenhandedly there is nothing discriminatory about instructing employees to stay out of other departments except as is necessary in the performance of their

---

**2.** Three of the four reprimands were imposed prior to the organizational campaign.

**3.** The court would reach the same result by applying the standard formulated by the Board in *Wright Line, a Division of Wright Line, Inc.*,

251 NLRB 1083, *enforced* 662 F.2d 899 (1st Cir. 1981).

**4.** All § 8(a)(1) violations are given the numerical designations given by the ALJ (A. pp. 28–32).

duties. Any part of the Board's order dealing with violation number (2) of § 8(a)(1), admonishing Meadows to stay out of the inspection department, will not, therefore, be enforced. The admonition was particularly reasonable in light of Meadows' disciplinary record and the fact that his loitering in the inspection department had been complained of on several prior occasions before the inception of any union campaign at the plant.

Though many of the other § 8(a)(1) violations rest upon dubious credibility resolutions, which would surely fall when applied to the substantial evidence test, we need not address them in particular. Because some of the § 8(a)(1) violations would pass that test, the Board's remedy will not be substantially altered by striking some violations and enforcing others. Enforcement is, therefore, granted as to the § 8(a)(1) violations except the two involving Meadows.

ENFORCEMENT DENIED IN PART, GRANTED IN PART.

K. K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority in its conclusions regarding the firing of Ralph Meadows and the other unfair labor practice issues. However, I must dissent from the majority's refusal to enforce the NLRB's bargaining order.

Because of the pervasive unfair labor practices by the company, the NLRB entered a Gissell[1] bargaining order on the basis of cards authorizing representation by "the AFL–CIO and/or its appropriate affiliate." The thorniest question in this case is whether, by signing these cards, the employees at Burlington effectively had designed the ACTWU as their bargaining agent. My brethren entirely avoid considering this issue by holding that there were not enough properly solicited cards to constitute a majority anyway. For reasons which I will outline below, I believe the cards solicited by Meadows should be counted, with the result that the union did hold a pre-election majority, and I would enforce the bargaining order.

I.

The Burlington employees signed cards stating,

"I desire to be represented by a Union which is part of the AFL–CIO and I hereby designate the AFL–CIO and/or its appropriate affiliate as my Bargaining Agent."

According to Gissell, employees are "bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606, 89 S.Ct. at 1936. In my view, nothing said by Ralph Meadows "deliberately and clearly canceled" the explicit language of the cards.

Contrary to the majority's characterization, Ralph Meadows' testimony on this subject is anything but plain. He testified that when soliciting signatures, he had told his co-employees, in one way or another, that the cards were "just for percentage of representation to ask for an election" or were "merely for representation." When asked if he had said that the cards were "only for an election," he emphatically stated, "No, no, no, for the representation for the percentage." Even the ALJ, who heard Meadows testify, was confused and concluded that Meadows had indicated that "the need for an election and representation were the sole [sic] purposes of the cards."

Considering the fogginess of Meadows' explanation of what he told his co-workers, we should look to the only unambiguous statement that was made: the printed statement on the cards. Meadows maintained that he told everyone to read the cards before signing, and we have no reason to doubt that they did so. If anything is clear in this case, it is that Burlington employees signed cards which expressed their desire to be represented.

1. NLRB v. Gissell Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

## II.

In *Gissell*, the Supreme Court held that a union may be able to gain recognition and establish a bargaining obligation if the employer's unfair labor practices nullify an election. The Court recognized that an election is not the only method of proving majority status; rather, an employer has a duty to bargain "whenever the union representative presented 'convincing evidence of majority support.'" *Id.* at 596, 89 S.Ct. at 1930.

The problem in this case is that the cards did not specifically name the ACTWU as the union, but rather named the "AFL–CIO and/or its appropriate affiliate." In fact, two weeks after the cards were signed, the ACTWU was designated as the local affiliate, and not one employee revoked his card. Certainly, at that point, before the employer's unfair labor practices began to take their toll, there was "convincing evidence of majority support." Thus, in my view, the NLRB correctly concluded that a bargaining order was an appropriate remedy,[2] and I would enforce that decision.

2. The Board reached this result on facts strikingly similar to those in this case in *Breaker Confections*, 163 NLRB 882 (1967). The Company challenges the continued validity of *Breaker Confections* in light of a more recent case, *O & T Warehousing*, 240 NLRB 386 (1979), which held that "AFL–CIO and/or its designated affiliate" could not appear on a ballot, but that the specific local must be designated prior to the election. The point in *O & T* was that the employees could not simply leave that decision up to the AFL–CIO.

The Company's reliance on *O & T* is misplaced. For one thing, this is not the same situation as *O & T* where, although the NLRB nipped an election in the bud, it can fairly be assumed that a local soon was designated and another election was held; this case, on the other hand, involves a *Gissell* bargaining order, a remedy used in cases where the Board has determined that another election is impossible. Moreover, as there was evidence of majority support for the ACTWU only two weeks after the cards were signed, the employees in this case, unlike in *O & T*, were obviously not planning to leave the ultimate decision up to the AFL–CIO.

