NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

KEYSTONE PRETZEL BAKERY,
INC., Respondent.

No. 81–2067.

United States Court of Appeals,
Third Circuit.

Argued Feb. 2, 1982.

Reargued Before the Court In Banc
Nov. 8, 1982.

Decided Dec. 29, 1982.

**258**

William Wachter, Susan Tepper Papadopoulos (argued), Attys., N.L.R.B., Washington, D.C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., for petitioner.

Shawe & Rosenthal, Earle K. Shawe, Warren M. Davison (argued), Leslie R. Stellman, Baltimore, Md., for respondent.

Argued: February 2, 1982

Before GIBBONS, WEIS and GARTH, Circuit Judges.

Reargued En Banc: November 8, 1982

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

This case is before us on the application of the National Labor Relations Board pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1976 Supp. V 1981), for enforcement of orders issued against Keystone Pretzel Bakery, Inc. on May 24, 1979 and June 2, 1981.[1] The Board found that the company violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the Act by engaging in activities aimed at discouraging union membership, and by refusing to bargain with a union having a membership card majority in the bargaining unit. As a part of its remedy the Board imposed a bargaining order. We enforce in full.

### I.

Keystone is engaged in the production of pretzels at its Lancaster, Pennsylvania plant. The company, which employs about 40 people, was purchased in December 1976 by President Glen Hyneman and Secretary-Treasurer Horace Groff. Several months after that purchase, Bakery and Confectionary Workers International Union of America, Local 6, began organizing Keystone's production and maintenance employees. By June 1, 1977 the Union had obtained authorization cards from seventeen employees in what it regarded as an appropriate bargaining unit of twenty-nine employees, and petitioned the Board for a representation election. No election was held, however, for on June 16, 1977 the Union filed an unfair labor practice charge with respect to Keystone's activities after its officers learned of the organizing effort. On August 31, 1977, the General Counsel filed a complaint and issued a notice of hearing. After a hearing an administrative law judge, on June 23, 1978, found that Keystone had interfered, restrained and coerced employees in the choice of a bargaining representative, but that the Union had lacked authorization cards from a majority of an appropriate bargaining unit. Thus the administrative law judge did not recommend imposition of a bargaining order. The General Coun-

1. The orders are reported at 242 NLRB 492 (1979) and 256 NLRB 334 (1981).

sel, the charging party, and Keystone all filed exceptions, and the Board, rejecting Keystone's exceptions, on May 24, 1979 made the first order for which enforcement is sought. That order finds appropriate a bargaining unit consisting of all full and part-time production and maintenance employees, excluding a truckdriver, office clerical employees, and supervisors. It finds that various forms of interference, restraint and coercion took place, and that those unfair labor practices were so substantial and pervasive that they disrupted the election process, thus precluding a fair election and warranting a bargaining order.

The Board petitioned this court for enforcement. In response, on September 9, 1980, Keystone moved pursuant to section 10(e) of the Act to remand to the Board in order to adduce additional evidence to the effect that changes in the membership of the bargaining unit since the union obtained its authorization cards would cast doubt upon the propriety of a bargaining order "at this late date." On October 8, 1980 a two judge panel of this court granted that motion. The Board moved for reconsideration of that order by the court in banc, and on November 14, 1980 this court denied the Board's motion, four judges dissenting.

On remand the Board notified the parties that they could file statements of position on the issues raised by the remand. Accepting as true the employer's affidavit describing personnel changes in the bargaining unit, the Board concluded that no evidentiary hearing was required, and declined to withdraw its earlier bargaining order. Once again the Board petitioned for enforcement. Keystone resists enforcement, contending that: (1) there is insufficient evidence to support the Board's findings of unfair labor practices; (2) the Board erred in defining the appropriate bargaining unit; (3) the Board erred in determining that a majority of the bargaining unit had authorized the Union to bargain on its behalf; and (4) the Board's statement of reasons is

insufficient to justify a bargaining order. We consider those contentions seriatim.

## II.

Under section 8(a)(1) of the Act it is an unfair labor practice for an employer to interfere with, restrain or coerce in the exercise of the right of employees, guaranteed by section 7, to organize, and to bargain collectively through chosen representatives. The administrative law judge who heard the testimony found that Keystone had violated section 8(a)(1) by authorizing employee Douglas Shertzer to conduct surveillance of union activity and report, by coercively interrogating employees Ken Rohrer and Charles Swift, and by coercing employee Ken Hall to refrain from union activity. He also found that Keystone, with knowledge of the union activity, solicited and promised to resolve employee grievances, and grant benefits; conducted an employee meeting on a holiday, for attendance at which employees were paid, and conducted an employee poll at that meeting; and through President Hyneman expressed satisfaction at a negative vote. The administrative law judge also found that Keystone violated sections 8(a)(1) and (3) when it denied a pay raise to union adherent Hall, while giving a raise to a union foe, Schertzer. The Board adopted these findings.[2] We have reviewed the testimony, and conclude that the findings respecting these activities are amply supported. Moreover, they fully support the Board's conclusion that Keystone engaged in a pattern of unfair labor practice reasonably tending to coerce or intimidate employees in the exercise of section 7 rights. See, e.g., NLRB v. Garry Manufacturing Co., 630 F.2d 934, 937 (3d Cir.1980); NLRB v. Eagle Material Handling, Inc., 558 F.2d 160, 165 (3d Cir.1977); Hedstrom Co. v.

---

2. The Board also found that a remark made by Hyneman to employee Rohrer, "Here is your check, union steward," was a section 8(a)(1) violation, although the administrative law judge who heard testimony about the incident considered the remark to be jocular and thus not coercive. Since there is ample evidence in the record sustaining the Board's other unfair labor practice findings, we need not resolve Keystone's objection to this one.

*NLRB,* 558 F.2d 1137, 1144 & n. 18 (3d Cir.1977); *NLRB v. Armour Industries, Inc.,* 535 F.2d 239, 242 (3d Cir.1976); *NLRB v. Triangle Publications, Inc.,* 500 F.2d 597, 598 (3d Cir.1974) (The test of coercion and intimidation is whether the misconduct is such that, under the existing circumstances, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected by the National Labor Relations Act.)

### III.

■ Under section 9(b) of the Act the Board has broad discretion in determining what is an appropriate bargaining unit. *E.g., Allied Chemical Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971); *NLRB v. St. Francis College,* 562 F.2d 246, 248 (3d Cir.1977). Before the Board the parties were in agreement as to the inclusion of twenty-eight employees contended for by the General Counsel. Keystone objected to the exclusion of seven others. These included three bakers whom the administrative law judge found to be supervisors and thus excludable as a matter of law. 29 U.S.C. § 152(11) (1976). These findings as to supervisor status, approved by the Board, are supported by substantial evidence. The administrative law judge excluded from the bargaining unit a truckdriver, Russ Yoder, whose work was mostly outside the plant, on the ground that he lacked a community of interest with plant employees. In doing so he noted that the Union expressed a preference for Yoder's exclusion, and that under Board precedent unrepresented truckdrivers may be either included in or excluded from a production and maintenance unit depending on the wishes of the petitioning union.[3] The Board approved this determination. We find no abuse of discretion. Finally the administrative law judge found that Joanne Herbst, a part-time employee, first included in the General Counsel's list, but later objected to as a casual employee, should be included. The Board approved her inclusion.

The unit approved by the Board, therefore, consisting of all full and part-time production and maintenance employees, excluding the truck driver, office clerical employees, and statutory supervisors, apparently included a stipulated list of twenty-eight people plus Joanne Herbst, a total of twenty-nine. Since the Board's findings are supported by substantial evidence, the exclusion of three supervisors was required by law, and the exclusion of Yoder, the truck driver, was a matter within the Board's discretion, we must approve the makeup of the bargaining unit.[4]

### IV.

■ The General Counsel placed in evidence seventeen authorization cards (GC Exhibits 3–19). Since these comprise a majority of the twenty-nine members in the approved bargaining unit, Keystone urges that the Board erred in relying on them as evidence that the union could bargain for those members. The authorization cards are unequivocal. Each is on a printed form as follows:

LOCAL NO. 6
B. & C. W.I.U. of A. — AFL–CIO
5416 Rising Sun Ave. Phila. Pa. 19120–329–8933

I _____
    Print Name    (Date employed)
the undersigned, employee of the _____
    (Name of Company)
Home Address _____ Phone _____
City _____
hereby authorize the Bakery and Confectionery Workers Local No. 6 to represent me and, in my behalf, for the purpose of collective bargaining to negotiate and con-

---

3. *See* Pacemaker Mobile Homes, 194 NLRB 742 (1971); Fayette Manufacturing Co., Inc., 193 NLRB 312 (1971); Marks Oxygen Co., 147 NLRB 228 (1964).

4. We do not reach the question whether the Board's exclusion of Leroy Hyneman and Michael Boaman from the bargaining unit was, considering their close identification with management, an abuse of discretion.

clude all agreements in respect to rates of pay, wages, hours of employment, or other conditions of employment.

Department_____ Shift_____ Job Title_____

Signature of Employee _____ Date _____

Each of the seventeen cards is filled in with the employee's name and address, phone number, and job description, and each is signed by a Keystone employee. No objection is made about their authenticity.

Keystone offered no testimony impeaching the authorization cards. It makes two contentions with respect to the sufficiency of the General Counsel's showing: that the General Counsel's showing of authorization was legally insufficient, in that he failed to adduce testimony that each employee read the card before signing it, or that it was read to the signer; and that in any event, in the General Counsel's own case, there is testimony impeaching the cards.

In appraising Keystone's contentions, the starting point must be the Board's decision in *Cumberland Shoe Corp.,* 144 NLRB 1268 (1963), which holds that when a card states on its face that it authorizes collective bargaining it will be counted for that purpose unless it is established that the employee who signed it was told it would not be used for that purpose, but solely for another purpose. Under the *Cumberland Shoe* rule the General Counsel need do no more than produce duly authenticated cards authorizing collective bargaining. The Supreme Court has expressly approved the Board's customary analysis of the consequences of signing such cards.

> The customary approach of the Board in dealing with allegations of misrepresentation by the Union and misunderstanding by the employees of the purpose for which the cards were being solicited has been set out in *Cumberland Shoe Corp.,* 144 N.L.R.B. 1268 (1963) and reaffirmed in *Levi Strauss & Co.,* 172 N.L.R.B. No. 57, 68 L.R.R.M. 1338 (1968). Under the *Cumberland Shoe* doctrine, if the card itself is unambiguous (*i.e.,* states on its face that the signer authorizes the Union to represent the employee for collective

bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election.

*NLRB v. Gissel Packing Co.,* 395 U.S. 575, 584, 89 S.Ct. 1918, 1924, 23 L.Ed.2d 547 (1968). This holding confirms that the General Counsel establishes a prima facie case of authority to bargain collectively by producing unequivocal authorization cards from a majority of members in the bargaining unit. The holding is consistent with the settled rule that an employer may rely upon such cards to recognize a union and enter into a collective bargaining relationship. *NLRB v. Atlas Lumber Co.,* 611 F.2d 26 (3d Cir.1979); *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 143 (3d Cir.1975); *Suburban Transit Corp. v. NLRB,* 499 F.2d 78, 82–83, 85–86 (3d Cir.), *cert. denied,* 419 U.S. 1089, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974); *NLRB v. Air Master Corp.,* 339 F.2d 553, 556–57 (3d Cir.1964). Certainly an employer examining an unequivocal card authorization for collective bargaining is under no obligation to inquire beyond the four corners of the instrument before deciding to recognize a union holding authorization cards from a bargaining unit majority. When an employer, instead, refuses to recognize a card majority there is no reason why a higher burden of coming forward with proof of employee intention should be placed upon the General Counsel. There is no presumption that union adherents are any more likely not to read what they have signed than are members of the public at large. If they have signed an unequivocal authorization for collective bargaining they should, like anyone else, be presumed to have intended what the card says, absent proof of an unambiguous representation by the solicitor that the card will not be used for the stated purpose even if the employer should agree to bargain. Thus we reject Keystone's contention that the General Counsel failed to establish a prima facie case of majority representation.

Keystone's alternative contention, that the General Counsel's evidence impeached the cards, is predicated on the testimony of union organizer Murray, with respect to three of them. With respect to a card signed by employee Kline, Murray testified on direct:

I asked her if she coud [sic] care to sign a card to bring an election in, for the purpose of negotiating a contract, to better the wages, working conditions, etc., the benefits and things of this nature. And she signed the card in front of me and her husband.

With respect to employee Geyer, Murray testified:

I told Mrs. Geyer that the purpose of the card was to bring a federal election in the plant, conducted by the National Labor Relations Board, for the purpose of negotiating a contract for wages, better benefits, working conditions and etc.

With respect to the Mays card the following colloquy occurred:

JUDGE SCHNEIDER: Mr. Murray, I understand that before Ms. Mays signed the card, you told her the purpose was to get a contract negotiated in the plant for better working conditions?

THE WITNESS: The purpose was to bring an election in the plant for contract negotiations, of better wages, working conditions and benefits, yes sir.

JUDGE SCHNEIDER: To bring an election in the plant?

THE WITNESS: Yes, sir.

On cross-examination Murray testified that he told every employee whose card was solicited that it would be used to get a board-supervised election at the plant.

Murray's testimony about the purpose of the cards was certainly truthful, since authorization cards always have a dual purpose. If the employer refuses to recognize a card majority the cards may be used to obtain a representation election. But neither Murray nor any other witness testified that any signer was told that the *sole* purpose of the cards was to bring about a representation election. The Board found:

Murray's statements that the cards would be used to get an election did not negate, and were not inconsistent with, the clear and unambiguous statement on the cards that the signers authorized the Union to represent them for the purposes of collective bargaining. We find nothing in the circumstances surrounding the solicitation of the cards which would indicate that Murray deliberately and clearly directed these employees to disregard the language on the cards, or otherwise assured them that their cards would be used for no purpose other than to get an election.

242 NLRB at 494.

Having so found, the Board relied on the cards as evidence that the Union represented a majority of employees in the bargaining unit. That holding is entirely consistent with governing precedent. In *General Steel Products, Inc.,* which was consolidated with *NLRB v. Gissel Packing Co.,* the Supreme Court observed:

In *General Steel,* the trial examiner considered the allegations of misrepresentation at length and, applying the Board's customary analysis, rejected the claims with findings that were adopted by the Board and are reprinted in the margin.[5]

---

5 "Accordingly, I reject Respondent's contention 'that if a man is told that his card will be secret, or will be shown only to the Labor Board for the purposes of obtaining election, that this is the absolute equivalent of telling him that it will be used "only" for purposes of obtaining an election.' . . .

"With respect to the 97 employees named in the attached Appendix B Respondent in its brief contends, in substance, that their cards should be rejected because each of these employees was told *one* or *more* of the following: (1) that the card would be used to get an election (2) that he had the right to vote either way, even though he signed the card (3) that the card would be kept secret and not shown to anybody except to the Board in order to get an election. For reasons heretofore explicated, I conclude that these statements, singly or jointly, do not foreclose use of the cards for the purpose designated on their face."

395 U.S. at 584–85, 89 S.Ct. at 1924–25. The Court ordered enforcement of a bargaining order in *General Steel*. In its first post-*Gissel* case considering the effect of unequivocal authorization cards this court observed:

> In *Gissel* the Supreme Court upheld the *Cumberland Shoe* doctrine of the N.L.R.B. and held that evidence of intention in signing an unambiguous single-purpose union authorization card is not pertinent in the absence of evidence that the signing employee *was clearly told that the sole purpose of the card was to bring about an election* to determine the status of the Union. (Footnote omitted) (emphasis supplied).

*NLRB v. Boyer Brothers, Inc.*, 448 F.2d 555, 561 (3d Cir.1971), *cert. denied*, 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132 (1972) (footnote omitted, emphasis supplied). That opinion explained, further, that "the teaching of *Gissel* is that the *purpose* of an employee in signing a card is conclusively presumed to be authorization of the Union to represent him if the card signed so states unambiguously and if no one has explicitly represented to him that the card has a different purpose." *Id.* at 562. More recently, in *Hedstrom Company v. NLRB*, 558 F.2d 1137 (3d Cir.1971) (*Hedstrom I*), we held that cards of employees who were told that an election was a purpose of their cards were valid for determining majority representation. Only when a union adherent soliciting a card stated affirmatively "that the sole purpose of his signing an authorization was to get an election" could the card be disregarded. *Id.* at 1150 n. 34. The caselaw in other circuits is to the same effect.[5]

Under the governing caselaw, therefore, the testimony of organizer Murray on which Keystone relies to impeach the General Counsel's prima facie case of majority representation is legally insufficient. The Board's holding that a majority of the employees in the bargaining unit authorized the union to represent them is supported by the seventeen cards in evidence.

### V.

▮ Turning to the question whether the Board's reasoning adequately supports a bargaining order based on a card majority, we note that this case falls within what this court customarily characterizes as a *Gissel* II case: a factual situation in which an employer has engaged in unfair labor practices, and those practices, while not so outrageous as to prevent the holding of a free election, nevertheless have a tendency to erode union support.[6] A bargaining order in the *Gissel* II category requires, as we have found, that the union has a valid card majority. Thus for this case only two inquiries remain: whether the Board initially gave adequate reasons for its conclusion that a bargaining order was required, and whether it gave adequate reasons for concluding on remand that a bargaining order was still required despite the passage of time.

In its initial decision the Board justified a bargaining order as follows:

> We further find that the unfair labor practices committed by Respondent warrant the issuance of a bargaining order in

---

**5.** E.g., *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1349 (9th Cir.1980) (Board did not err in finding that statement, "[I]f we got a majority, that we would have an election. . . . We have to have an election in order to get the union in," was not a statement that card was to be used solely to get an election); *Tipton Electric Co. v. NLRB*, 621 F.2d 890, 895 (8th Cir.1980) ("Here, as in *Gissel*, the employees were told that if sufficient cards were signed, an election would be made possible but the totality of the circumstances surrounding the card solicitation was not such as to add up to an assurance to the signers that the cards would be used for no other purpose than to help get an election");

*Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 508 (7th Cir.1980) ("[a] union representative told him that the card was 'to form a committee so there could be an election.' Although this incomplete explanation of the card approached the outer limit of valid solicitation, the union representative did not refute the unambiguous language of the card. . . .").

**6.** *See Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir.1980) *(in banc), cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). Compare *United Dairy Farmers Cooperative Association v. NLRB*, 633 F.2d 1054 (3d Cir.1980).

this case. The record shows that Respondent embarked on its course of unlawful conduct shortly after the Union's organizational campaign began in April, when it engaged in surveillance and encouraged and authorized employee Douglas Shertzer to engage in surveillance. Respondent's course of unlawful conduct continued through May, when Respondent unlawfully granted Shertzer's wage increase, withheld Hall's wage increase, continued its surveillance of union activities, and interrogated employees as to their union activities. Respondent's unlawful activity culminated in the May 31 employee meeting, during which Respondent solicited and promised to satisfy employees' grievances, promised and subsequently granted retroactively raises to almost all employees, and conducted an unlawful poll. We find that this campaign of serious and extensive unfair labor practices had the tendency to undermine the Union's majority strength and impede the election process. In this regard, we agree with the Administrative Law Judge's findings that in 1 week the Union's support in the plant had been obliterated and that the result of the May 31 poll more reliably reflected the success of Respondent's unfair labor practices than the employees' uncoerced desires. We further find that the possibility of erasing the effects of Respondent's unfair labor practices and of ensuring a fair election by the use of traditional remedies is slight. Therefore, for all the above reasons, we conclude that the employees' sentiment, once expressed through authorization cards, would, on balance, be better protected by our issuance of a bargaining order than by traditional remedies.

242 NLRB at 494. This statement of reasons for the original entry of a bargaining order fully satisfies the requirements of intelligent judicial review and the legal standards for *Gissel II* bargaining orders articulated by this court. *NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir.1981) (*in banc*), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982).

In its supplemental decision following this court's remand order the Board considered whether evidence of employee turnover warrants modification of the original order and concluded that it did not. The Board reasoned:

Respondent's unfair labor practices, as summarized in the Board's original Decision, included conduct which, in the Board's experience, tends to have a continuing effect on employee freedom of choice long after the conduct has ended. Thus, upon learning through an unlawful solicitation of grievances that its failure to give pay raises was a major source of employee discontent, Respondent promptly raised the pay of virtually every unit employee. Such an unprecedented pay raise in the midst of a union campaign has been found to be particularly coercive because it eliminates "the very reason for a union's existence." That effect was further heightened in this case because the pay raise followed—and rewarded—the employees' "vote" in an unlawful poll which revealed that Respondent's unlawful campaign had been so successful that not one employee indicated support for the Union. Thus, the lesson to be learned by Respondent's employees was that the rejection of a union was the means by which to assure the receipt of improved wages and benefits. A corollary to this lesson, which has been recognized by the Board and courts, is that the employees' departure from this preferred antiunion stance may result in the withholding of benefits in the future.[8] Such a lesson, once learned, is not forgotten quickly but continues to exert a restraining influence on employee free choice.

Nothing in the evidence presented by Respondent indicates that the employee turnover since the election has vitiated the effect of these unfair labor practices. Thus, nearly half of the current employees were employed while Respondent was engaged in its campaign of surveillance, interrogation, solicitation, and the implied promise to remedy grievances, and the actual grant of benefits as a reward for

their rejection of the Union. Further, all 14 of the current unit employees who were in Respondent's employ at the time of the unfair labor practices received the pay raise which we have found to be unlawful. Thus, a substantial portion of the current employee complement was not only in a position to be aware of Respondent's unlawful actions, but, in fact, was subjected to such unlawful conduct. Finally, Respondent's conduct remains unremedied and at no time has Respondent given assurances to its employees that such conduct will not recur.

We further find that the passage of time from the date of Respondent's unlawful conduct has not rendered a bargaining order inappropriate. Assuming, *arguendo,* that Respondent is correct in alleging that a majority of its employees no longer supports the Union, any current expression of employee sentiment is necessarily tainted by the lingering effect of Respondent's unfair labor practices. In any event, the Board and courts have long held that a union's loss of majority status following the commission of unfair labor practices by an employer sufficient to warrant the issuance of a bargaining order does not require a change in the Board's remedial order, for "a requirement that union membership be kept intact during delays incident to hearings would result in permitting employers to profit from their own wrongful refusal to bargain." [9] The delay in the Board's issuance of its Decision and in seeking enforcement of its Order in this case, while regrettable, does not alter our conclusion in this regard. Such delay has in no way diminished the coercive effect of Respondent's serious and extensive unfair labor practices. Further, we find that Respondent has suffered no prejudice from the delay and note that Respondent at all times had the option, which it chose not to exercise, of seeking court review under Section 10(f) of the Act.[10]

[8] See, e.g., *N.L.R.B. v. Exchange Parts Company,* 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964). Respondent's willingness to retaliate against employees who supported the Union is exemplified by its action in withholding a wage increase from employee Hall in violation of Sec. 8(a)(3) of the Act.

[9] *Franks Brothers Company v. N.L.R.B.,* 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944). See also *Hedstrom Co. v. N.L.R.B.,* 629 F.2d 305, 321 (3d Cir.1980), *N.L.R.B. v. L.B. Foster Company,* 418 F.2d 1, 4, 5 (9th Cir.1969), cert. denied 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970), and *Gibson Products Company of Washington Parish, La., Inc.,* 185 NLRB 362 (1970).

[10] See *N.L.R.B. v. Pool Manufacturing Co.,* 339 U.S. 577, 581, 70 S.Ct. 830, 832, 94 L.Ed. 1077 (1950), where the Court in similar circumstances stated, "The employer, who could have obtained review of the Board order when it was entered, [Section] 10(f), is hardly in a position to object."

256 NLRB at 335–36 (footnote 7 omitted). Plainly, the Board has disclosed to us the reasons for its reaffirmation of the appropriateness of a bargaining order. As we noted in *Hedstrom Co. v. NLRB,* 629 F.2d 305, 311 (3rd Cir.1980) (en banc) (*Hedstrom II*), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), once those reasons have been articulated our role is to do no more than determine whether the Board, in effectuating the policies of the Act, has acted within the bounds of its broad discretion in adopting remedies to the needs of the situation before it. Indeed we can discern no legally significant distinction between the situation presented in this case and that which we considered in *Hedstrom II.*

Thus we reject Keystone's challenge to the adequacy of the Board's statement of reasons for issuing a bargaining order and for declining to modify its order because of the passage of time.

## VI.

The Board's order will be enforced in full.

ADAMS, Circuit Judge, concurring.

Although I join the majority opinion, I write separately to express my concern about one issue. Judge Weis' dissent raises a substantial point as to the validity of the authorization cards used in this proceeding. If this were a case of first impression, I might well have agreed with him. His position, as I understand it, is that a card

should not be counted for purposes of a bargaining order when there is no evidence that an employee has read the union card before signing it, and there is evidence that a union agent in obtaining the signature on the card represented only that the card would be used for an election. There is much to commend such a position, since the NLRA itself admonishes us to take steps to protect the right of each employee to vote for or against union affiliation. However, after carefully reviewing the Supreme Court's opinion in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), I am persuaded that that decision compels the conclusion that a card under these circumstances must be considered valid for determining union representation.

In *Gissel,* the Court held that "employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606, 89 S.Ct. at 1936. Inasmuch as the Court in *Gissel* sustained the use of authorization cards where some of the employees had been told, as they were in the present case, "that the card would be used to get an election" (395 U.S. at 584 n. 5, 89 S.Ct. at 1925 n. 5), it must have concluded that such a statement alone did not rise to the level of misrepresentation necessary to cause the employees to ignore the card's printed text. Nothing in the facts of the proceeding before us today would indicate that the union representative's conduct here converted his statement to "words calculated to direct the signer to disregard and forget the language above his signature." Accordingly, I join the majority in upholding the validity of these cards.

BECKER, Circuit Judge, joins in this concurrence.

WEIS, Circuit Judge, dissenting, with whom JAMES HUNTER, III and GARTH, Circuit Judges, join.

The stated policy of the National Labor Relations Act is to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151. That freedom is best assured by secret elections, which the Board concedes is the preferable method for selecting a collective bargaining representative.

In the few instances where a fair election cannot be held, an alternative, albeit less reliable, means of ascertaining the employees' choice of a bargaining representative is through union authorization cards. We have cautioned, however, that "[f]reedom of association and free selection of a bargaining agent ... may be substantially diminished by dependence on authorization cards." *NLRB v. K & K Gourmet Meats,* 640 F.2d 460, 469 n. 4 (3d Cir.1981). The case at hand illustrates these dangers. The Board, in issuing the bargaining order, improperly relied on several authorization cards for its conclusion that the union had established majority support. The Board compounded this error by its failure to adequately examine the effect of employee turnover in the bargaining unit, as directed by this court in an earlier remand. For these two reasons, I dissent from the enforcement of the bargaining order.

### I.

As the excerpts from the hearing quoted in the majority opinion demonstrate, a number of employees who signed authorization cards were told that the purpose of the card was to get an election in order to negotiate a contract. Majority Op. at 262. Of these employees, the ALJ found that there was no showing that Mays, Kline, and Geyer read the cards before signing them. He noted that the union organizer's representation as to the purpose of the cards differed from the language printed on them, and that no other evidence was produced indicating that the signatures were meant to designate the union as bargaining representative. Accordingly, the ALJ held that "[t]he burden being on the General Counsel to establish that the Union represented a majority, an absence of proof that, in such circumstances, the employee read the card,

precludes a finding that the card constitutes a designation."

In reversing the ALJ, the Board found that the organizer's statements were not inconsistent with the unambiguous language on the cards. It further found that "nothing in the circumstances surrounding the solicitation of the cards" indicated that the organizer "deliberately and clearly directed these employees to disregard the language on the cards, or otherwise assured them that their cards would be used for no purpose other than to get an election." The Board did not comment on the burden of General Counsel to establish a union majority as a prerequisite for a bargaining order and commented only that he had "established, through Murray's testimony and the unambiguous language on the face of the authorization cards, the *prima facie* validity of the cards signed by Mays, Kline and Geyer."

The Board's conclusion that there was no inconsistency between the cards and the representations made by the union organizer is puzzling, to say the least. Its determination that General Counsel established a *prima facie* case of the cards' validity is, at best, incomplete.

In *NLRB v. Gissel*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court warned that misrepresentation in the solicitation of authorization cards was an abuse to which the Board must be alert. The Court approved the Board's *Cumberland* rule that a card is valid "unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election." *Id.* at 584, 89 S.Ct. at 1924 (emphasis in original). The Court also quoted with approval the Board's later explanation of the *Cumberland* doctrine:

"The Board looks to substance rather than form. It is not the use or nonuse of certain key or 'magic' words that is controlling, but whether or not the totality of the circumstances surrounding the card solicitation is such, as to add up to an assurance to the card signer that his card will be used for no purpose other than to help get an election."

395 U.S. at 608 n. 27, 89 S.Ct. at 1937 n. 27, *quoting Levi Strauss & Co.,* 172 N.L.R.B. 732, 733 n. 7 (1968).

The Court cautioned against a "too easy mechanical application of the *Cumberland* rule," 395 U.S. at 608, 89 S.Ct. at 1937, and stated that "the trial examiner's findings in *General Steel* ... represent the limits of the *Cumberland* rule's application. We emphasize that the Board should be careful to guard against an approach any more rigid than that in *General Steel.*" *Id.* at 608–609, 89 S.Ct. at 1937.[1]

In *General Steel* the trial examiner found authorization cards valid even though statements at odds with the unambiguous language of the card were made by a union representative. Among the findings made by the trial examiner were these:

"All of these cards were *read by or to each signer* thereof.... [C]onsideration of all the testimony pertaining to the circumstances under which the signatures were obtained convinces me that ... all these employees not only intended, but were *fully aware* that they were thereby designating the union as their representative." \

*General Steel Products, Inc.,* 157 N.L.R.B. 636, 645 (1966) (emphasis added). Thus, even though there was a variation between what appeared on the printed card and what the employees were told, the trial examiner had an evidentiary basis for finding that they were aware of these differences and chose nevertheless to sign the authorization.

No such evidence is present in this case. The ALJ who heard and saw the witnesses found specifically that there was "no showing that the card signers read the card.... [T]he evidence in those instances shows only that the employee signed a card on the

---

1. The *General Steel Products, Inc.* case was one of four cases consolidated and decided in *NLRB v. Gissel.*

representation that its purpose was to secure an election." Those conclusions are compelled by any fair reading of the record. The statement that signing the card would serve to bring an election into the plant cannot be read as anything other than inconsistent with the wording on the cards which designated the union as the bargaining representative and said nothing about an election. Surely, it is obvious that designating a particular union to act as one's representative is far different from expressing a desire for an election to determine whether a particular union is to be selected. *See Burlington Industries, Inc. v. NLRB,* 680 F.2d 974, 976 (4th Cir.1982).

In its decision here, the Board recognized that "[o]ne factor ... in the 'totality of circumstances' is whether the employees read the cards." Even though the Board agreed that there was no evidence that the employees read the three cards, it nevertheless concluded that they were valid designations. In reaching this conclusion, the Board, in its rush to impose a bargaining order, has stretched its policy of crediting authorization cards beyond the limits which the Supreme Court drew in *Gissel.*

Unlike other forms of agreements recognized by the law, a variance between oral representations of a solicitor and the text of a union authorization card does not necessarily invalidate the card's printed terms. As noted earlier, *Gissel* found an authorization card valid even though the solicitor stated it would be used to get an election. The Court's rationale was that "employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by the union adherent with words calculated to direct the signer to disregard and forget the language above the signature." 395 U.S. at 606, 89 S.Ct. at 1936.

This oft quoted statement of the Court points up two pertinent factors passed over by the Board. First, oral representations can vitiate the language of a card. Accordingly, the mere act of signing is not conclusive, and on a proper evidentiary record, viewed under the totality of the circumstances, a card may be declared invalid. Second, if a card may be nullified because an oral representation induced the employee to disregard the printed language, then it follows that the signer must, in the first instance, have knowledge of the text. An instruction to disregard the wording on a card can have significance only if the employee has read it.

If a person, of his own accord and uninfluenced by misrepresentation, chooses not to read a card before signing it, then the misrepresentation would be irrelevant. If, however, a person decides not to read a card on the basis of what he is told, then the text does not express the signer's intent. *See Gissel,* 395 U.S. at 607, 89 S.Ct. at 1936 (employees are sufficiently sophisticated to be bound by what they sign *unless* expressly told act of signing represents something else). Rather, the signature represents agreement with the representations of the solicitor. Such an analysis explores the subjective motivations of the signer no more than the inquiry whether the magic words "solely" or "only" affected the signer's decision, and thus does not offend *Gissel's* admonition against probing an employee's intent. *See id.* at 608, 89 S.Ct. at 1937.

The *General Steel* rationale leads to the conclusion that in choosing to sign a card notwithstanding misrepresentations by the solicitor, the employee indicates his willingness to abide by the text. Where, as here, no evidence demonstrates that the signer knew what was printed above his name, then there is no basis for assuming that he was agreeable to the card's terms. In the absence of any other explanation, one must conclude, as did the ALJ, that the signatures were obtained *solely* on the misrepresentation that the card would be used to get an election. Based on undisputed evidence, the record therefore satisfied the *Cumberland* test.

Although General Counsel has the burden of establishing the fact of a union majority, the Board did not squarely confront this problem. It skirted the issue by stating that General Counsel had made a *"prima facie* [showing of] validity" through the tes-

timony of the union solicitor and the language of the cards. I will not dispute here the majority's statement that in the usual case, General Counsel, in order to meet the burden, "need do no more than produce duly authenticated cards [unequivocally] authorizing collective bargaining." Majority Op. at 261. The employer is then free to attack the validity of the authorization. However, General Counsel did not follow that procedure here.

As part of his case, General Counsel produced the union organizer who testified not only that the three employees signed the cards but that he made statements to them which the ALJ found inconsistent with the text. General Counsel, therefore, went beyond proof of authenticity. His witness established a variance between what was printed and what was represented, and had therefore placed the validity of the cards into contention at this stage of the proceeding. Having presented the ambiguity as part of his case, General Counsel could not rely on the mere showing of authenticity to establish a *prima facie* case. Nor could the Board ignore the totality of the evidence in evaluating whether General Counsel had met his burden of establishing a union majority.

Under the *General Steel* rationale, General Counsel could have proved his case by further testimony that the three employees had read the cards. If so, there would be evidence that, despite the inconsistency in the organizer's statements, the employees chose to be bound by the language of the card. Absent such testimony, however, all that the record shows is that the employees signed the cards in the belief that their action could result in an election. That clearly is not proof of consent to union representation. *See NLRB v. South Bay Daily Breeze*, 415 F.2d 360, 366–67 (9th Cir.1969), *cert. denied*, 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970); *L.C. Cassidy & Son, Inc. v. NLRB*, 415 F.2d 1358, 1363–64 (7th Cir.1969). Nor is it the substantial evidence that the Board must have to sustain its decision in this court.

The Board's conclusion that the evidence demonstrates a union majority is difficult to reconcile with its insistence upon "laboratory conditions" to insure freedom of choice when holding secret elections. The card process, with such admitted shortcomings as overt peer pressure, and frequent misrepresentations or misunderstandings, should require even more demanding standards than those governing elections. The Board prohibits electioneering near the polls so that employees may vote without being subjected to last minute importuning. *See Season-All Industries, Inc. v. NLRB*, 654 F.2d 932, 936–37 (3d Cir.1981). Yet it does not hesitate to count as a "vote" a card secured by statements that distort the meaning of what the employee is signing.

The Board's standards are the reverse of what they should be. Proof of a majority manifested by cards should whenever possible be established by evidence at least as convincing as that demonstrated by a secret election. There were no obstacles to such proof here. It is the facts that should preclude the result reached by the Board.

II.

The Board's failure to adequately address the effect of changes in the bargaining unit also calls into question the propriety of enforcing the bargaining order. Soon after the appeal was filed in this court in 1980, the employer moved to remand the case to the Board to adduce additional evidence. Attached to the motion was an affidavit demonstrating that significant changes in the bargaining unit had occurred in the three-year period following the May 1977 unlawful practices. The unit had grown from 29 to 33 persons, only 14 of whom were employed in May 1977. Of the 14, only 7 had signed union authorization cards. If the bargaining order had been enforced in 1980, only 7 of the 33 members of the bargaining unit would have been signatories to authorization cards. Of those seven, one is a signatory to a card I would find invalid.

The motion for remand was granted, and the Board again considered the matter. It decided to forego a hearing and accepted

the affidavit as correct. Nevertheless, the Board declined to alter its bargaining order, remarking that "nearly half" of the current employees were with the company during the occurrence of the unfair labor practices, including the 1977 pay raise which the Board found to be unlawful. The Board added, "Respondent's conduct remains unremedied and at no time has Respondent given assurances that such conduct will not recur." The Board also determined that "neither the passage of time nor employee turnover in the bargaining unit has dissipated the impact of Respondent's unfair labor practices, and therefore the possibility of erasing the effect of Respondent's unfair labor practices and of ensuring a fair election through the use of traditional remedies remain slight."

Since the Board refused to have a hearing which would form a basis for such findings, the only evidence in the record on which to justify them is the employer's affidavit. But no ground for its conclusions exists in that document. The Board's statements are simply conclusions without any supporting basis. There is not one scrap of evidence to support the assertion that a fair election could not have been held in 1980, or that an appropriate cease and desist order would not have been effective in preventing any interference with laboratory conditions.

Under analogous circumstances, Judge Frank commented in a dissenting opinion:

Reversed [on the previous appeal, the Interstate Commerce Commission] comes back to us with a report manifesting no real regard for our criticism. The Commission's position now is that we must be satisfied if only it recites a formal abracadabra to which it has added a few words as a sop to us.[78] That position I think should not satisfy this court—not at all because I consider judges inherently better than Commissioners, for I certainly do not, but because Commissioners, like judges, owe an obligation to do their job, as prescribed by statute, in a manner, which, within practical limits, publicizes the rational bases of their performance.

[78] Judicial review, if the Commission is correct, is as important as was the Statute of Uses which, it was said, merely "added three words to a conveyance."

*Old Colony Bondholders v. New York, New Haven & Hartford Railroad Co.,* 161 F.2d 413, 449 (2d Cir.), *cert. denied sub nom., Protective Committee for Bonds of Old Colony Railroad Co. v. New York, New Haven & Hartford Railroad Co.,* 331 U.S. 858, 67 S.Ct. 1754, 91 L.Ed. 1865 (1947) (footnote omitted).

The Board's action on remand was not an adequate compliance with the order issued by this court, *see NLRB v. American Cable Systems, Inc.,* 427 F.2d 446, 448–49 (5th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970), and its bargaining order is a denial of the rights granted to the employees by the National Labor Relations Act. The Board's desire to punish the employer has once again resulted in greater harm to the employees, the intended beneficiaries of the Act. *See Electrical Products Division of Midland-Ross Co. v. NLRB,* 617 F.2d 977, 991 (3d Cir.), (Weis, J., concurring and dissenting), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980).

What this court said in *Rapid Manufacturing Co. v. NLRB,* 612 F.2d 144, 151 (3d Cir.1979), is equally applicable here:

"We would be remiss in our judicial function if, on a record as sparse as this one, we were to enforce a bargaining order which, on every count, cannot even be regarded as colorably in compliance with *Gissel.*"

I dissent.